919 F.Supp. 793 (1996)
CHRISTEN G., by her guardian and next friend, LOUISE G., and Louise G.
v.
LOWER MERION SCHOOL DISTRICT, et al.
Civil Action No. 94-7742.
United States District Court, E.D. Pennsylvania.
February 21, 1996.
*794 *795 *796 *797 Penelope A. Boyd, Downingtown, Pennsylvania, for plaintiffs.
Kenneth A. Roos, Michael D. Kristofco, Wisler, Pearlstine, Talone, Craig, Garrity & Potash, Blue Bell, Pennsylvania, for defendants.

MEMORANDUM
RAYMOND J. BRODERICK, District Judge.
This is an action brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Christen G. ("Christen") and her mother, Louise G., assert that Christen has Attention Deficit Hyperactivity Disorder (ADHD) and that the Defendants failed to offer a free appropriate public education to Christen as required by law. Plaintiffs seek reimbursement for private school education costs incurred by Louise G. when she placed Christen at Delaware Valley Friends School during the years in which Plaintiffs allege Lower Merion School District failed to provide a free appropriate public education.
Defendant Lower Merion School District ("Lower Merion") and other Lower Merion school officials named as Defendants have asserted that they did not fail to offer Christen a free appropriate public education, and that any reimbursement of costs for Christen's attendance at Delaware Valley Friends School is barred by the First Amendment of the United States Constitution because DVFS is a sectarian school. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.
Trial was held by the Court on August 7 and 8, 1995. In accordance with 20 U.S.C. § 1415(e)(2) of the IDEA, the Court is also in receipt of the records of earlier administrative proceedings in which Plaintiffs sought review of decisions by the Lower Merion School District regarding Christen's educational placement.
For the reasons stated below, which are Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a), judgment will be entered in favor of Defendants on Plaintiffs' IDEA claims arising from the 1993-94 school year. For IDEA claims arising from the 1994-95 school year, the Court will enter judgment in favor of Plaintiffs against Lower Merion School District and award tuition reimbursement to Louise G. equal to the cost of Christen's education at Delaware Valley Friends School for the 1994-95 school year.

I. INTRODUCTION
Before discussing the detailed facts and procedural history of this case, a brief overview of the legal framework underlying the contentions of the parties as well as the *798 meaning of several statutory terms at issue will be helpful.
Under the Individuals with Disabilities Education Act ("IDEA"), a state receiving federal funds for the education of handicapped children must provide those children with a "free appropriate public education." 20 U.S.C. § 1412(a). "`[F]ree appropriate public education' consists of educational instruction designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child `to benefit' from the instruction." Board of Education v. Rowley, 458 U.S. 176, 188-89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982). The benefit conferred by this special education must be "meaningful" and not trivial or de minimis. Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir.1988).
The "centerpiece" of the IDEA's education delivery system for disabled children is the Individualized Education Program or ("IEP"). Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1988). "`The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive.'" Oberti v. Board of Educ., 995 F.2d 1204, 1213 n. 16 (3d Cir.1993) (quoting Polk, supra, at 173). In order to satisfy the requirements of the IDEA, the instruction and services offered by the state "must be provided at public expense, must meet the state's educational standards, must approximate the grade levels used in the state's regular education, and must comport with the child's IEP." Rowley, supra, at 204-05, 102 S.Ct. at 3049.
The IDEA provides extensive procedural protections to the parents of disabled children, including participation of parents in the development of the IEP, the right to review all relevant school records, and "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(1). When a parent has a complaint, she may request an "impartial due process hearing." 20 U.S.C. § 1415(b)(2). States have flexibility in choosing to implement a one or two-tier administrative review system, and Pennsylvania has chosen to offer "a two-tier system in which the initial hearing occurs at the local educational agency level followed by an `independent' review of that hearing at the state educational agency level." Carlisle Area School District v. Scott P., 62 F.3d 520, 527 (3d Cir.1995).
A party aggrieved by the final determination of the state agency is entitled to bring an action "in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e). In any such action, "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, grant such relief as the court determines is appropriate." Id. As will be discussed infra, a court must give "due weight" to the state administrative proceedings in making its decision. See Rowley, supra, at 206, 102 S.Ct. at 3051.
"In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed." Carlisle, supra, at 533. If a court determines that a school has offered an inappropriate education for a child, and an aggrieved parent has unilaterally chosen to place her child in an appropriate placement, appropriate relief may be ordered. Courts have often approved relief in the form of tuition reimbursement to the parent for the costs of educating her child during the period in which the school district failed to offer a free appropriate public education in accordance with its obligations under the IDEA. See Florence County School District Four v. Carter, 510 U.S. 7, ___, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993); School Committee of Burlington v. Department of Education, 471 U.S. 359, 370-71, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985). However, a parent who chooses to educate her child in a placement other than that offered by the school does so at her own financial risk in the event that the *799 school's offered placement is determined to be appropriate. See id.
In this action, Plaintiffs have also sought relief under the Rehabilitation Act of 1973. Section § 504 of the Rehabilitation Act provides that:
No otherwise qualified individual with a disability in the United States as defined in section 706(8) of this title shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...
29 U.S.C. § 794(a). To establish a violation of this section, a plaintiff must demonstrate that: (1) she is disabled as defined by the Act; (2) she is otherwise qualified to participate in school activities; (3) the school receives federal financial assistance; and (4) she was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. See W.B. v. Matula, 67 F.3d 484, 494 (3d Cir.1995). A plaintiff need not establish that there has been an intent to discriminate by defendants in order to prevail, but defendants must know or be reasonably expected to know of her disability. See id.
The Third Circuit has noted that "[t]here appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition. Indeed, the regulations implementing § 504 adopt the IDEA's language, requiring that schools which receive or benefit from federal financial assistance `shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" Id. (citing 34 C.F.R. § 104.33(a)). Monetary damages are also available under the Rehabilitation Act. See id.
Finally, Plaintiffs have also sought relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. However, as Plaintiffs submitted proposed conclusions of law to the Court related only to their IDEA and Rehabilitation Act claims, the Court will deem Plaintiffs to have waived their ADA claim.

II. Factual Background

A. Kindergarten through 8th Grade
Christen G. was born on June 18, 1979. She attended Abington Friends School from kindergarten through grade 4. A:15 (indicating Administrative Record at 15). Christen was then enrolled in the Lower Merion School District, and began 5th grade at the Cynwyd School in September 1989. A:17.
During 5th grade, Christen began to experience some difficulties and her mother, an experienced educator and subsequently a member of the Lower Merion School Board from 1991 to 1995, noticed that Christen seemed anxious and depressed. A:17-18; 66-68. A psychological evaluation of Christen was performed for Lower Merion School District in March 1990 by Dr. Janice Schulman, who concluded that Christen was scoring in the "high average range of intelligence, with evidence of both neurological and emotional factors intruding on somewhat higher intellectual potential." Dr. Schulman also noted "some auditory processing weakness, perceptual deficits, and impulsivity; anxiety and emotional confusion also impair her concentration and divert her reasoning." Parent Exhibit 1.
Following this report, Christen was classified as "exceptional" and the School District developed an Individualized Education Program (IEP) for Christen to commence in the 6th grade. A:22. This first IEP provided that Christen would be in "regular" 6th grade, with "Mixed Category Learning Disabled Resource Room for English and daily support 5 times per week." Parent Exhibit 2. Louise G. participated in the development of this first IEP and all subsequent IEPs as Christen's parent throughout Christen's education. A:69-70, 74.
Christen participated in 6th grade with resource room support and was promoted to 7th grade. Nevertheless, Louise G. felt that Christen was experiencing "decline" in both her academic performance and in her self-esteem. A:27. Christen continued to experience difficulties in 7th grade, including an inability to complete assignments; she failed math in the second quarter. A:31.
*800 While in 7th grade, Christen was again evaluated by a psychiatrist for the School District in February 1992. Dr. Sandra Zebrowski noted some signs of attention deficit disorder, and recommended that Christen continue in special education. Dr. Zebrowski also recommended that Christen work with a tutor on remedial learning skills, and that her mother seek a private psychiatric evaluation of Christen for potential counseling as well as use of medication to address evidence of attention deficit. School Exhibit 23. During that school year, Louise G. arranged for some outside tutoring and Christen was also prescribed Ritalin, a drug for treatment of attention deficit disorder. A:97; 221-22. Christen made some progress towards meeting goals set forth in her 7th grade IEP, but she finished the 7th grade school year with three `C's in major subjects and a `D' in math. A:27-28, 31, 73.
Revised IEPs for the seventh and eighth grade prescribed special instruction for Christen, including smaller classes to help her maintain attention and extended time for taking tests. Parent Exhibits 4, 5. Louise G. and Christen believe Lower Merion did not implement many IEP components; Lower Merion officials assert that they did implement Christen's IEP, and that Christen was unable or unwilling to cooperate with review sessions, extended time for exams, individualized assignments, and other special instruction provided to her. See, e.g., A:26, 36-37, 40, 277, 304-07, 582-584, 586, 613, 618-19, 643-44.
In December 1992, during her eighth grade year, Christen was evaluated at a medical facility known as Children's Seashore House. After a physical examination, review of Christen's history and various psychological tests, the examining physician summarized her diagnosis as Attention-Deficit Hyperactivity Disorder ("ADHD") with "learning differences." The physician recommended increased dosage of ritalin and counseling for behavioral management. Parent Exhibit 18. Christen subsequently began private therapy in February 1993 with Dr. Susan Anderer, a certified school psychologist with a doctorate in clinical psychology. A:207-08. Dr. Anderer saw Christen once a week until the summer of 1993 when Christen took a break to attend summer camp; counseling resumed in the fall of 1993, and has continued to the present. A:233, 240.
In the latter part of eighth grade, Christen's academic and behavior problems at school became severe. Although Christen received an "Outstanding" for her resource room work at the beginning of eighth grade, she was in danger of failing math, science and social studies by the third quarter. A:37-38; 392. The record shows that she eventually did fail history for that year. Parent Exhibit 19.
In the second part of the school year, Christen was reported to school authorities for causing disturbances in class and was suspended; school officials also suspected her of various acts of vandalism. Parent Exhibit 19; A:37-38, 637-638. Christen herself testified that she believed her teachers "didn't care" and "wouldn't try any effort to teach me" and that she had "just sort of given up and got suspended." A:279. Christen was restricted from participating in class trips and after school activities, and removed from music class for two weeks on the ground that the teacher was unable to conduct class because Christen's behavior was so disruptive. Parent Exhibit 19. On at least one occasion outside of school, Christen was picked up by the local police. A:37, 53.
In light of Christen's actions and parental concern, Christen was fully evaluated again by the School District. A Multidisciplinary Evaluation ("MDE") was performed with input from Christen's resource room teacher, William Dolton; Margery Anderson, assistant principal at Bala Cynwyd; Dr. Betsy Granite, a school psychologist working at Bala Cynwyd; and other school officials. School Exhibit 22; A:380. Louise G. was also given the opportunity to provide input as a member of this Multidisciplinary Team ("MDT"). A:74. As part of this evaluation, Dr. Granite administered a number of psychological tests to Christen in April 1993. The May 17, 1993 MDE, of which Dr. Granite was the primary author, made the following recommendation to the IEP team:

*801 Christy's evaluation indicates that she needs both a learning and an emotional support program. Some test signs indicate depressive tendencies which need to be explored further. Parent is strongly urged to seek an outside medical consultation in light of Christy's impulsive style, inattentiveness, and signs of depression. In addition, continuation of outside counseling is recommended.
School Exhibit 22. Louise G. felt that this report was "excellent" overall. A:76. The MDE report was subsequently provided to an IEP team, of which Louise G. was also a member, to develop an IEP for Christen's ninth grade year. A:74, 399.
During this time, Louise G. had also taken steps to enroll Christen at Delaware Valley Friends School (DVFS). DVFS is a private school for children in grades 7 through 12 with learning differences, offering small class sizes (4 to 10 children) and a college preparatory curriculum. DVFS is operated "under the care of the Philadelphia Quarterly Meeting of the Religious Society of Friends." School exhibits 10, 11. Louise G. had first attended an open house at DVFS while Christen was in seventh grade, and Dr. Anderer, after treating Christen, recommended that Christen apply to DVFS for ninth grade. A:55; 211. Louise G. testified before this Court that she sent an application and check for $60.00 to DVFS on April 26, 1993, and Christen filled out a student application as part of the DVFS admissions process and visited DVFS sometime in May 1993. A:123. Louise G. also contacted the School District on June 4, 1993 to ask that the May 17, 1993 MDE report be sent to DVFS. Notably, Louise G. requested that the District make some deletions in the MDE before sending it to DVFS because she "was afraid that [Christen's] behavior would keep her out of Delaware Valley Friends." A:75-76; School Exhibit 25.
Meanwhile, based on the May 17, 1993 MDE, a new IEP was developed which recommended that Christen be educated outside the school district at an approved private school beginning in ninth grade in September 1993. This IEP, dated June 11, 1993, further specified that the level of intervention which would be implemented for ninth grade at the approved private school would consist of full-time learning support for instruction as well as behavioral and emotional support. This IEP included similar provisions incorporated in earlier IEPs, as well as new provisions which were specifically designed to address Christen's ADHD. A behavior management program was also required. See School Exhibit 9.
Louise G. attended an IEP review meeting and submitted additional comments on July 31, 1993, which were later incorporated into a revised IEP dated September 7, 1993. A:56, 89; Parent Exhibits 11, 17. However, Louise G. believed that Christen did not need emotional help and that the IEP was flawed in its inclusion of an emotional support component in Christen's education. A:89-91.
Based on the June 11, 1993 IEP, Lower Merion issued a Notice of Recommended Assignment (NORA) dated July 7, 1993. This NORA recommended placement of Christen in a full-time learning support class outside regular school. Lower Merion subsequently identified three potential placements for Christen: The Wordsworth Academy, the Devereux Day School, and the Project School, which is operated by Montgomery County. Wordsworth Academy and the Devereux Day School were each certified by the State of Pennsylvania as an "approved private school" for placement of exceptional students.
Louise G. made a phone call to each of these schools in July 1993. Based on these phone conversations, Louise G. concluded that each school provided a "therapeutic" environment oriented towards emotional support and that "[i]n all three situations the population of students were students who were emotionally disturbed, that only 10 percent sounded like they might be like my daughter out of the population there, and that the kids had social and emotional difficulties." A:52. Louise G. also concluded that college attendance by students in these programs was "low." See id. Based on these conclusions, Louise G. believed that these schools were not appropriate placements for Christen. See id. Louise G. and Christen did not visit any of the three proposed *802 placements or take any further steps in the admissions processes for these schools. A:93-96; School Exhibits 15-21. In testimony before this Court, Louise G. stated that she believed that her daughter needed an academic program that would prepare her for college, with emphasis on learning differences and not emotional problems.
Louise G. communicated to Lawrence Sweigert, director of pupil services for Lower Merion School District, that she did not believe the proposed placements were appropriate. A:627. Louise G. also testified before this Court that Sweigert told her that those were the only schools that Lower Merion could offer.
Correspondence between the recommended schools, Lower Merion, and Louise G. indicates that school officials expected to proceed with evaluation of Christen for admission. For example, the principal of Wordsworth Academy wrote Louise G. on August 11, 1993, stating that after review of Christen's records Wordsworth officials believed their program offered Christen an "excellent chance for success." School exhibit 18. The Wordsworth principal urged Louise G. to schedule an intake interview as soon as possible. See id. Sweigert testified that Lower Merion did not formally designate one of the three placements for Christen because Louise G. and Christen did not proceed with school interviews, and the schools wanted an opportunity to interview the student and parent before commenting "on their ability to implement a particular educational plan." A:623. Louise G. ultimately rejected the 1993-94 IEP because of the schools offered by Lower Merion. A:89. When asked at the administrative hearing which part of the IEP she disagreed with in addition to the recommended placements, Louise G. identified only the emotional development component of the IEP as another reason for her rejection, stating that she would have to "read the whole thing" to answer the question. A:91.
In July 1993, Louise G. sent an additional $600.00 check to Delaware Valley Friends School, and Christen was subsequently enrolled as a full-time student for the 1993-94 school year.

B. Delaware Valley Friends School
As described supra, Delaware Valley Friends School (DVFS) is a private school for children with learning differences. Located in Bryn Mawr, Pennsylvania, the school has over 100 students among grades 7 through 12. See School exhibits 10, 11.
DVFS materials describe the school's mission as follows:
The mission of Delaware Valley Friends School is to prepare students who have learning differences for future work and study. The school develops those personal strengths which enable students to succeed in its college preparatory curriculum. In keeping with Quaker beliefs and values, the school fosters a desire to learn, a spirit of creativity, a strong sense of self-worth, and a respect for the worth of others.
Id. DVFS maintains that all of its graduates have been accepted into college, and often have a choice of which college they might attend. The DVFS materials also state that DVFS does not discriminate on the basis of sex, race, religion, sexual orientation, or on the basis of national or ethnic origin, in admissions and financial programs, in the administration of its educational program, or in employment policies. See id.
The DVFS admissions process requires student and parent questionnaires and interviews, a complete and current psychological evaluation of the student, and the student's current school records. An admissions committee composed of board members, faculty and staff evaluate the student's admissability, which includes a decision as to whether the student's emotional or behavioral difficulties are such that the DVFS program cannot provide an appropriate education for that student. A:122-123. DVFS does not accept children with identified emotional problems. A:260.
Once admitted, DVFS offers students a low student-to-teacher ratio of 4 to 10 students in each class and a variety of individualized instruction and assistance. DVFS develops and revises its own IEP. A:160. Teachers are certified in their content areas and continually trained by the school in learning styles and teaching strategies to *803 address the learning differences of students, but teachers are not generally certified as special education teachers. A:120. DVFS provides extensive and varied feedback to students, including separate grades for "effort" as well as "in-house" grades every three weeks. Students are also educated in the nature of their disabilities and learning styles, and are encouraged to take responsibility for themselves. A:121, 154.
DVFS is not certified by the State of Pennsylvania as an approved private school for public school placement of exceptional children. According to the testimony of Irene McHenry, who was head of DVFS since its founding in 1987 through the 1993-94 school year, DVFS is classified by the state of Pennsylvania as a non-public school with a religious affiliation. A:120. No students are funded by public monies, although DVFS does receive public funding for textbooks and for transportation of students within a 10-mile radius of the school. As a Friends School, 50% of the board members of DVFS must be Quakers. A:133, 136.
A student's education at DVFS includes a mandatory weekly "meeting for worship." The structure of this meeting for worship is in accordance with Quaker religious practices, and is similar to the format used by Quaker religious groups in the Philadelphia area. As described by Ms. McHenry at the administrative hearing:
MCHENRY: The entire school community, including all faculty, staff, and students, gather together in one room and sit in silence for half an hour.
At the beginning of the year I explain to everyone that the purpose of that sitting is to get in touch with  the Quakers believe that there is that of God in every person. Sitting in silence is to be in touch with that of God or that inner spirit that is within each of us.
If someone feels moved by a matter of heart or a matter of conscience to speak out loud to the community in that spirit, that is acceptable during a meeting for worship.
Often the meeting is silent. Occasionally, a staff or faculty member or a student will speak to something that is important, issues like death and dying, AIDS, good sportsmanship, friendship, respect for people who are different, sometimes things that are happening in the world at large, such as when the Wall came down, the Persian Gulf War. Sometimes people speak about those things.
SCHOOL COUNSEL: Would you agree that the meetings are an integral part of the school culture?
MCHENRY: Yes.
A:134-135. Ruth Greenberger, who is the current head of DVFS, testified in a deposition as follows:
SCHOOL COUNSEL: Now, the meetings that are held is (sic) held once a week?
GREENBERGER: Yes.
SCHOOL COUNSEL: Who attends?
GREENBERGER: All of the students and all of the faculty and staff.
SCHOOL COUNSEL: Is it mandatory?
GREENBERGER: Yes.
Defendants' Proposed Findings of Fact and Conclusions of Law, Exhibit C, at 21.
At the administrative hearing, Ms. McHenry stated that it was "unfortunate" that the word "parochial" was being used to describe DVFS. She stated that a Friends School does not have religion classes per se, and that "a mission of a Friends School is not to make someone a Quaker or specifically teach Quakerism." A:121-122. Ms. McHenry added:
MCHENRY: The mission of a Friends School is to model and teach good human values like integrity, honesty, responsibility, respect.
In our missions statement we say that one of our missions is to help people develop a sense of respect for themselves and for others, a sense of service, and a sense of good citizenship.
So, that's something that we work on all the time through the advisory system, through the way teachers work with students in classes in terms of respecting differences and, in the case of Delaware Valley Friends School, respecting differences *804 in learning styles and abilities and disabilities.
A:122.
Ruth Greenberger, who is the current head of DVFS and who is not a Quaker, testified at the administrative hearing as follows:
PLAINTIFFS' COUNSEL: [A]re members of the staff required to be members of or adhere to Quaker beliefs prior to being hired by the school?
GREENBERGER: Not at all. They have to believe that there is something precious about every individual. As a non-Quaker, I don't even go so far as saying there is that of God in every person. But there is something holy and sacred about every person. Therefore, it's very important how people treat each other. And I think that in order to work in the school you have to be able to go that far.
PLAINTIFFS' COUNSEL: Are there non-Quakers other than yourself on your staff?
GREENBERGER: Mostly non-Quakers. I think about 10 percent of the staff is Quaker.
A:366.
In testimony before this Court, Greenberger agreed that students were taught in accordance with Quaker beliefs and values and that it was not possible for a student to go to DVFS and not be exposed to Quaker beliefs. She noted, however, that there is no compulsion to discuss religious beliefs, that there is no study of religion or the Bible, and that the meeting for worship does not need to be on the topic of a higher being.
Testimony at trial and DVFS materials established that Christen's tuition at DVFS for the 1993-94 school year was $13,200, minus a $2,500 scholarship, for a total of $10,700. Tuition was $14,200 for the 1994-95 school year, plus an additional $400 for computer use, minus a $3,500 scholarship, for a total of $11,100. At trial, Louise G. testified that most of her tuition bill for the 1994-95 school year remains unpaid.

C. The 1993-94 School Year
DVFS followed its usual student admissions practices with respect to Christen's application for the 1993-94 school year. A:124. McHenry, who participated in the admission process, stated that Christen appeared to her to present a "familiar profile," specifically "a bright [attention deficit disorder] student who has been having failure experiences in school," and that such a profile was common in other students at DVFS with attention deficit disorder. A:124-125. Ruth Greenberger, now head of DVFS but serving as dean of students at the time of Christen's admission, acknowledged that DVFS staff had some concerns about the appropriateness of their program for Christen because of her "emotional component" and her "troubles," but that they believed the school could help her through "tight structure" and counseling. A:262-263. Lisa Barsky, a psychologist at DVFS, explained that DVFS had relied on the testing done by Lower Merion in developing DVFS's program for Christen and that DVFS had required Christen to continue therapy for the purpose of easing the transition from the Lower Merion School District to DVFS. A:169, 192, 194-95.
DVFS found that Christen has problems with auditory attention, focus, and impulsivity. A:128. As part of their regular curriculum, Christen was placed in a class of nine students for English, history and science, with a smaller class for math. A:126. She had an additional class of "writing lab," in which the use of a computer was an essential component. See id. She also had classes in fine arts and in physical education, as well as after school electives. A:127. DVFS provided Christen with the option of using a word processor to take her exams or to have her exams given orally, with the possibility of requesting additional time. A:129.
Testimony at the administrative hearing by Greenberger, McHenry, and Gray Goodman, Christen's ninth grade advisor, history teacher and soccer coach, established that Christen enjoyed strong success in her initial months at DVFS. A:131, 257, 324-325. Her DVFS teachers found that the use of visual aids, simulations, and physical positioning of Christen within the classroom to minimize *805 distraction were very helpful. A:317-18, 326-27. Christen also testified about her education at DVFS, describing the positive experiences she had with different teaching strategies employed by her DVFS teachers, her new enjoyment of school, and her increased self-confidence and initiative. A:285-286, 293. Louise G. testified that Christen was a "different person" after she began to attend DVFS, and that she was on the honor roll for both academic and effort grades in the first part of ninth grade and was no longer a behavior problem. A:60. Greenberger, as dean of students, testified that she was impressed by how Christen was able to take advantage of what DVFS offered Christen in terms of support and how she sought help on her own initiative when difficulties arose. A:263.
Although all parties have been consistently careful with regard to material relating to Christen's family life, the record is clear that Christen was also experiencing some difficulty and conflict at home prior to her admission to DVFS. A:81, 234. Dr. Anderer's diagnosis for purposes of treatment was ADHD, which Dr. Anderer asserted has an affect on all aspects of Christen's life. A:207, 233. As part of her therapy, Dr. Anderer tried to help Christen with her impulsivity and her feelings about her disability, as well as "typically adolescent" issues such as "difficulty with parents or concerns about her appearance." A:234. Dr. Anderer's therapy also tried to improve relationships at home, and on occasion during Christen's treatment Dr. Anderer met with Christen and her mother together, as well as Christen, her mother, and an unrelated adult also living in the household. A:234.
Dr. Anderer testified at the administrative hearing that therapy was only a "piece" of what had been helpful to Christen, and that when Christen resumed counseling in October 1993 after summer camp and after having attended DVFS, Christen was "doing better behaviorally." A:293. Louise G. also testified at the administrative hearing that she believed that Dr. Anderer's counseling had helped Christen, and that it had improved their relationship at home as well as Christen's relationships with her peers and with other people. A:86-87.
Shortly after Christen had started at DVFS in the fall of 1993, Lower Merion school officials contacted Louise G. regarding their frustration in completing the placement process for Christen. A:60. In a letter dated September 24, 1993, Lawrence Sweigert, Lower Merion's director of pupil services, stated that:
We're frustrated in our attempt to find an appropriate placement for Christy. I understand you were invited to schedule intake evaluations at the Project School, Wordsworth Academy, and the Devereux Day School. However, you opted not to do that:
School Exhibit 15. In this letter, Sweigert suggested that the IEP team be reconvened to "look again" at Christen's educational needs, and a conference was held on November 11, 1993. In attendance were Louise G.; Irene McHenry, the head of DVFS; Dr. Betsy Granite, the school psychologist at Bala Cynwyd and primary author of the May 17, 1993 MDE; Margery Anderson, Bala Cynwyd's assistant principal; William Dolton, the Bala Cynwyd resource room teacher; Lawrence Sweigert; and other Lower Merion school district employees. Sweigert subsequently prepared a report documenting this conference. See School Exhibit 5.
According to Sweigert's report, Louise G. asserted at the conference that Christen's earlier problems had been a result of the lack of an appropriate educational setting in Lower Merion to address Christen's ADHD, and that Christen did not need a program of emotional support in light of her progress at DVFS and her positive experiences at summer camp. McHenry supported this position, based on Christen's lack of behavioral problems and success to date at DVFS. A:131; School Exhibit 5. Lower Merion staff asserted that they had found that Christen had significant behavioral problems, and Louise G. and Lower Merion staff continued to dispute the behavioral needs of Christen, the extent to which her previous IEPs had been implemented by the District, and Christen's willingness to use learning support that the District had provided. Nevertheless, as *806 a result of the conference and Christen's apparent progress at DVFS, a representative of Lower Merion School District would be sent to DVFS to observe Christen and perform a re-evaluation of her educational needs. A:61; School Exhibit 5.
On February 18, 1994, Dr. Betsy Granite visited DVFS and interviewed Christen. Subsequently, a revised multidisciplinary evaluation dated April 15, 1994 was prepared for the School District. This MDE reviewed Christen's performance on a number of psychological tests in both February 1993 and in February 1994. Although one test administered to Christen's DVFS teachers showed that Christen was still significantly elevated for Hyperactivity and had continuing problems relating to impulsivity and attention span, other tests indicated that Christen was no longer experiencing any significant behavioral problem. After noting that Christen had a positive attitude toward learning and achievement and was a capable student, the MDE concluded that Christen still required various forms of assistance, including outlines, reminders and reinforcements to "stay on task," extra time for testing, and opportunities to interact with teachers on a more personal level. The MDE included the following recommendation to the IEP team:
Christy is exceptional and eligible for a Learning Support program (Itinerant Resource Room). Some test signs indicate that symptoms of ADHD are significant. Parent is urged to seek outside medical consultation regarding Christy's current medication to determine appropriateness of dosage and type of medication. In addition, continuation of outside counseling is strongly recommended.
School Exhibit 4.
After receiving this report, Louise G. informed the School District by letter that the new MDE was "far closer to my own assessment of my daughter's strengths and needs than was the previous assessment done in May 1993." Parent Exhibit 13. At the administrative hearing, Louise G. stated that she was "enormously impressed" with the report but did not believe that Christen should be returned to school in the District. A:61, 99. In a separate letter sent after receiving a copy of the MDE, McHenry of DVFS agreed with the MDE analysis but asserted that a resource room was not sufficient to meet Christen's needs. McHenry recommended full-time placement at DVFS. Parent Exhibit 13.
Meanwhile, Christen had continued to experience success at DVFS but some problems had become apparent in the latter part of the year. Gray Goodman, her advisor and history teacher, testified at the administrative hearing that Christen demonstrated strong academic and effort performance in English and writing lab over the year, but that her performance in other classes (including Goodman's own history class) "sort of leveled out in the wintertime and then actually wound down a bit." A:326. While Christen missed some three weeks of school in December due to illness and did a "fine" job of catching up, she began to experience difficulties in completing work despite various strategies on the part of Goodman and other teachers. A:347-353. Christen's academic success went up at the end of the year, but was uneven in the spring term. A:353. Although she was occasionally disruptive in class, interruptions or other actions requiring intervention by the DVFS dean of students were few. A:251. McHenry testified that Christen finished the 1993-94 year "really well," and both McHenry and Dr. Barsky, the DVFS school psychologist, attributed the "dip" in her performance in February to Christen's decision to try school without taking her ADHD medication. A:130, 158. Dr. Barsky testified that Christen still had impulsivity problems but that her self-esteem had improved dramatically. A:166.
Following the April 1994 MDE report, the Lower Merion IEP team met again to revise Christen's IEP. The resulting 1994-95 IEP was similar to the 1993-94 IEP in a number of respects, but it recommended that Christen return to regular classes and eliminated an emotional support component in her placement. In accordance with this new IEP, Lower Merion proposed to educate Christen in the 1994-95 school year at Harriton High School, a regular high school within the Lower Merion School District. Harriton offers classes ranging in size from 4 to 25 *807 students, with an average of 15 to 20 students per class, as well as resource room support which would be available to Christen. In accordance with a recommendation by the IEP team, both Louise G. and Christen visited Harriton High School but observed only regular classes. A:107.
On June 8, 1994, the School District issued a Notice of Recommended Assignment (NORA) for Christen recommending assignment to Harriton. In a letter dated June 11, 1994, Louise G. rejected the IEP and NORA based on a number of factors, including Harriton's larger class size, the methods of instructional delivery she had witnessed at Harriton, and her belief that the IEP did not "reflect an awareness of what children with ADHA (sic) need to become successful students." School Exhibit 2. At the administrative hearing, Louise G. testified that "a lot of what is in the 1994-95 IEP would help Christy," but she that believed Harriton was inappropriate and the School District would not be able implement the IEP. A:104.
After rejecting the IEP and NORA, Louise G. requested an administrative hearing in accordance with the IDEA and Pennsylvania law and informed the School District that she was also seeking reimbursement for tuition costs of Christen's 1993-94 school year at DVFS.

D. The Due Process Hearing
The hearing officer, Barbara Meranze, identified the issues before her as follows:
1. Did the Lower Merion School District offer Christy G. an appropriate program and placement for the 1993-94 school year?
2. Is Mrs. G. entitled to reimbursement for tuition payments to DVFS during the 1993-94 school year?
3. What is the appropriate program and placement for Christy for the 1994-95 school year?
In the course of the administrative hearing, Meranze heard testimony from Louise G.; Christen G.; Dr. Anderer, Christen's therapist; Dr. Lisa Barsky, school psychologist at DVFS; Irene McHenry, the head of DVFS; Ruth Greenberger, dean of students at DVFS and subsequent head of DVFS; and Gray Goodman, Christen's advisor and teacher, on behalf of the Plaintiffs. On behalf of the School District, Meranze heard testimony from Dr. Betsy Granite, school psychologist at Bala Cynwyd; Lawrence Sweigert, the director of pupil services; William Dolton, Christen's resource room teacher; and Margery Anderson, the assistant principal at Bala Cynwyd. Meranze also heard testimony from staff at Harriton High School, including Patricia Galie, a teacher; Norton Seamon, principal of Harriton; and Joan Lipman, a Harriton guidance counselor.
In addition to the extensive testimony regarding Christen's history and the different school programs summarized above, the hearing officer heard a variety of opinions from these witnesses regarding the nature of Christen's disabilities and other problems, the appropriate educational placement for her in the 1993-94 and 1994-95 school years, and particularly her need, if any, for an emotional support component in her education in the 1993-94 school year.
In discussing Christen's needs, Dr. Granite testified that she believed Christen had exhibited "many of the characteristics of more of a conduct disordered youngster than as (sic) of an ADHD youngster." A:385. Dr. Granite discussed the results of a variety of tests she had administered in April 1993 and stated that she was concerned about depression in Christen, as reflected in the May 11, 1993 MDE, and believed that "by saying [Christen] had ADHD the point was really missed on the diagnosis and what was wrong with Christen." A:383; 390. In Dr. Granite's view, Christen "needed a small structured environment where she could have time-out when she was emotionally stressed, needed to be closely monitored, have a structured behavioral system to insist she made choices within defined limits" throughout the day. A:401-02. Dr. Granite also testified that the level of intervention proposed in the 1993-94 IEP, which included an emotional support component, was consistent with her test results and the May 11, 1993 MDE report which she had developed with input from the Multidisciplinary Team. A:396-401.
*808 Margery Anderson, assistant principal at Bala Cynwyd during Christen's eighth grade year and a member of the IEP team, testified that she had concluded that Christen needed an emotional support program in the 1993-94 school year based on her experience of Christen's significant discipline problems and Christen's noncompliance with Lower Merion's educational program as well as Dr. Granite's psychological testing. A:632-37, 646. William Dolton, who supervised the resource room at Bala Cynwyd and who also participated in the IEP recommendation for 1993-94, testified that the 1993-94 IEP recommendation was based on Christen's inappropriate behavior, her inability to take advantage of the various learning support structures offered at Bala Cynwyd (which Dolton believed were similar to those subsequently employed by DVFS), and her need for more therapeutic kinds of support and a more structured setting than was available in public school. A:581-82, 585.
Dolton, Anderson, and Dr. Granite all testified that placement at an approved private school such as Wordsworth or Devereux which educate students with serious emotional disturbances is made with the hope that the student will eventually return to regular education in Lower Merion, and Dr. Granite noted that many students do return after a short placement. A:490, 584-85, 638-39. When asked to compare the "intellectually challenging nature" of these placements to DVFS, Dr. Granite explained that "[students] aren't going [to these placements] for the intellectual challenge. Students are referred there because their behaviors can often be so difficult or that are so out of control that they're there primarily behaviorally for them to gain a better sense of control over themselves, their emotions, their feelings, so that they can then participate within the regular school." A:490.
As to the 1994-95 placement at Harriton, Dr. Granite believed that significant emotional issues present in May 1993 were no longer present and the April 1994 MDE reflected this perspective. A:410. Granite believed that the newness of DVFS may have initially been a very positive change for Christen, and testified that the changes she observed in Christen at DVFS, such as Christen's willingness to take advantage of learning support in the form of outlines and other assistance similar to that offered by Lower Merion could have been the result of "a multitude of factors," including counseling and changes at home. A:402-408.
School officials from Harriton High also testified about Harriton's offerings and their belief that they could implement Christen's 1994-95 IEP provisions, including computer use, extra time for test taking, and class outlines. A:505-538; 542-546; 559.
On behalf of the Plaintiffs, Dr. Lisa Barsky, school psychologist at DVFS, testified that she did not believe that emotional issues were a primary problem for Christen. A:169. Dr. Barsky also believed placement of Christen with students suffering from serious emotional disturbance would result in Christen herself becoming emotionally disturbed due to a lower level of intellectual stimulation as well as Christen's tendency to adapt her behavior to that of other students. A:172-73. Dr. Barsky acknowledged that she had not observed programs at the Project School, Devereux, or Wordsworth and had only a general understanding of these institutions. A:205. Dr. Anderer, who was familiar with Wordsworth and Devereux, testified that she did not see Christen in the diagnostic category of students at those institutions because she believed Christen's problems were generated by her ADHD and not a result of severe emotional disturbance. A:211-13. Dr. Anderer, like Dr. Barsky, also believed that Christen would change her behavior to mirror the emotional behavior of other students if she was placed at Wordsworth or Devereux because of her tendencies to adapt to the nature of her peer group, and shared Christen's own concerns about leaving DVFS. A:214, 223-24, 291. Christen herself testified about her fears of returning to school in Lower Merion and how she wanted to able to attend DVFS. A:291-92, 298.
Both Dr. Barsky and Dr. Anderer emphasized that many features of the education Christen received at DVFS  i.e., small classes, above average intellectually motivated students, classroom focus on learning *809 strategies and acceptance of learning differences, and many adults available for emotional support  were key to her success. A:174, 240-41. Dr. Anderer, without having examined the 1994-95 IEP, testified that she did not know how Christen, "regardless of what's in the IEP," could receive what DVFS provided to her in the form of a "respectful" environment and ongoing support. A:237. After reviewing the IEP during her testimony, Dr. Anderer stated that Christen needed an education designed to address all aspects of her attention deficit disorder, recognizing both her intelligence and her impulsivity and need for an emotionally supportive environment. A:240-41.
In a decision issued on September 19, 1994, the hearing officer concluded that Lower Merion School District had offered Christen an appropriate placement for the 1993-94 school year. Specifically, the officer wrote that Louise G.:
spoke over the phone with representatives from several of the schools recommended by the District and on that basis alone, concluded that the schools would not be appropriate for her daughter. She did not return to the District to discuss her concerns or request additional recommendations, but instead decided to send Christy to DVFS. Since Mrs. G. did not dispute the IEP proposed by the District, and since she unilaterally decided to send Christy to DVFS, I hold that Lower Merion offered an appropriate program to Christy for the 1993-94 school year and that Mrs. G. was not entitled to tuition reimbursement for that year.
The hearing officer next found that Harriton High School, the placement offered by Lower Merion for the 1994-95 school year, could not successfully implement Christen's IEP. Specifically, the hearing officer concluded that in light of the District's own evaluations and Christen's success at DVFS, Christen required a more restrictive setting with a smaller class size than the average size of fifteen students that Harriton High School could offer.
After rejecting Harriton High School, the hearing officer concluded that DVFS did offer an appropriate placement for Christen for the 1994-95 school year. However, the hearing officer determined that DVFS was a "sectarian" school in that the teachings of the Society of Friends are embedded in DVFS' program and a weekly meeting for worship was held. Although noting that the beliefs of the Friends are "laudable," they are "nonetheless `religious' beliefs." The hearing officer found that under Zobrest v. Catalina Foothills School District, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) and Opinion No. 610 issued by Pennsylvania's Special Education Appeals Panel, which was also based on Zobrest, she could not order public payment of Christen's program at DVFS or tuition reimbursement to Louise G. The hearing officer then concluded by ordering Lower Merion to provide Christen with a program of special education consistent with her current IEP.

E. The Special Appeals Panel
Plaintiffs took exception to part of the decision of the hearing officer to a Special Appeals Panel, which identified the issues presented on appeal as whether:
A. the Hearing Officer erred in finding that the Lower Merion School District offered an appropriate public education program for Christy G. during the 1993-94 school year; and
B. the Hearing Officer erred finding that an order for reimbursement could not be issued since the Delaware Valley Friends School is a "religious" school.
After review of the record, the Appeals Panel concluded in an opinion dated November 23, 1994 that the administrative hearing testimony indicated that other than "the proposed location of the intervention and the identification of Christen as [having serious emotional disturbance], Mrs. G. did not recall any problems she had with the IEP as written." The Appeals Panel concluded that Louise G. had failed to "produce sufficient evidence to support the premise ... that the School district's program was indeed inappropriate." The Appeals Panel also concluded that in 1993 Louise G. "unilaterally placed Christy in DVFS without further consulting the District, thereby denying the School District an opportunity to respond to her concerns."
*810 Having reached this result, the Appeals Panel concluded that it need not address any First Amendment issues relating to reimbursement of DVFS tuition for the 1993-94 school year. Significantly, the Appeals Panel also noted:
Neither the parent nor the District has excepted to the Hearing officer's findings and order as to the 1994-95 school year. We therefore assume that the parties are in the process of implementing [an educational program for Christy consistent with the Hearing Officer's order]. We trust that they will do so as quickly as possible, so that Christy's educational needs will be attended to.

F. The 1994-95 School Year
The administrative record in this action does not include events in the 1994-95 school year after the November 23, 1994 Special Appeals Panel ruling and the hearing officer's decisions on September 19, 1994 finding Lower Merion's offer of placement at Harriton High School inappropriate and ordering Lower Merion to offer Christen an appropriate placement. Plaintiffs filed their complaint in this action on December 27, 1994, alleging in part that Lower Merion had failed to provide Christen with a free appropriate education to date. After several months of discovery, trial was held on August 7 and 8, 1995 and the parties submitted proposed findings of fact and conclusions of law. Testifying on behalf of the Plaintiffs were Christen G.; Louise G.; Ruth Greenberger, now head of DVFS; Dr. Susan Anderer, Christen's therapist; Dr. Lisa Barsky, school psychologist at DVFS; and Jon Cohen, a clinical therapist. Testifying on behalf of Defendants were Elissa Fisher, director of Hill Top Academy, a private school which the District was now recommending for Christen; Lawrence Sweigert, director of pupil services for Lower Merion; and Dr. Barbara Sohmer, a consulting psychiatrist. The following additional findings of fact are based on credible testimony by these witnesses before this Court.
After the decision by the hearing officer on September 19, 1994, that Harriton High School was not appropriate, the Court finds that Lawrence Sweigert again began the process of determining an appropriate placement for Christen. He initially identified five potential placements, including Hill Top Academy, a private school. He communicated the names of these schools to Louise G. on or about October 11, 1994.
Louise G. made another round of investigatory phone calls, including a call to Hill Top on October 17, 1994. Louise G. determined that Hill Top was the only school suggested by Sweigert that she felt might be appropriate for Christen, who was still attending DVFS. Louise G. communicated her opinions to Sweigert regarding the offered placements. Louise G. also scheduled an interview at Hill Top for December 5, 1994.
Hill Top Academy offers education to exceptional students between 11 and 20 years old, including students with Attention Deficit Disorder. The school has a student population of approximately 85 students, with forty full-time staff and a full clinical staff, and its educational program includes a mandatory group therapy component. Class size is usually between 6 to 8 students, and a small percentage of graduating students go on to higher education. Yearly tuition is $17,500. Hill Top does psychological testing as part of its admissions process, and does not accept students whose exceptional qualities stemmed from emotional difficulties. Hill Top could implement Christen's 1994-95 IEP in the beginning of the second semester or earlier.
Following the December 5, 1994 visit and Christen's interview, Hill Top Academy scheduled psychological testing of Christen for January 23 and 27, 1995. After the testing was conducted, Hill Top Academy communicated a "verbal acceptance" of Christen to Sweigert sometime in February, and he communicated this understanding to Louise G. Fisher testified that she understood from Sweigert that Lower Merion would pay for Christen's education at Hill Top and Hill Top held a place for Christen. Louise G. subsequently received a letter in February from Hill Top informing her of Christen's acceptance, but Hill Top did not forward the results of Christen's psychological testing  information which directly related to the nature *811 of the educational program which Hill Top would implement for Christen  to Louise G. until March 3, 1995.
Finally, on April 6, 1995, Lower Merion issued a Notice of Recommended Assignment (NORA) for Christen to attend Hill Top Academy. The NORA is Lower Merion's official offer of placement to a parent as well as the official notice to a school that Lower Merion will pay for Christen's education. After issuance of the NORA, Louise G. chose to keep Christen at DVFS because of her concern that changing schools in the last part of the school year would be too disruptive for Christen.
Plaintiffs have acknowledged in proposed findings of fact and conclusions of law submitted to the Court that Hill Top Academy could implement the 1994-95 IEP. However, Plaintiffs have also asserted that Hill Top is still inappropriate because Christen would suffer educational regression if she were removed from DVFS.

G. Additional Evidence
In proceedings before this Court, the parties also presented additional expert testimony which was not originally available to the hearing officer. Dr. Barbara Sohmer, a consulting psychiatrist and expert witness for Defendants, testified before this Court on behalf of the Defendants that Lower Merion had correctly identified Christen as suffering from serious emotional disturbance and that the June 1993 IEP with its inclusion of an emotional support component was appropriate. Dr. Sohmer based her findings on Christen's records, including Dr. Granite's reports and Christen's psychological testing.
Jon Cohen, a clinical therapist, testified on behalf of Plaintiffs as an expert in children with learning disabilities and differences. Cohen evaluated Christen in person on July 21, 1994, met with Louise G., and also reviewed various documents in Christen's record. Cohen administered a variety of tests to Christen, and based on these tests and his review of Christen's records, Cohen concluded that Christen has Attention Deficit disorder, and ruled out depression and anxiety conduct disorder.

III. DISCUSSION

A. Judicial Review Under the IDEA
As set forth by the United States Supreme Court in Board of Educ. v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982),
Insofar as a State is required to provide a handicapped child with a "free appropriate education, we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade level used in the State's regular education, and must comport with the child's IEP.
Rowley, at 204-05, 102 S.Ct. at 3049. The Court has further explained that:
[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.
Rowley, supra, at 206-07, 102 S.Ct. at 3051; accord Fuhrmann v. East Hanover Bd. of Educ, 993 F.2d 1031, 1035 (3d Cir.1993).
The specific provision of the IDEA permitting judicial review, 20 U.S.C. § 1415(e)(2), provides in relevant part:
Any party aggrieved by the findings and decisions made under [this section] shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing *812 its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
The Third Circuit has noted that:
In determining the scope of a district court's review under IDEA, the Supreme Court has stated that the statute's language instructing that the district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate," does not mean that courts are free to substitute their own notions of sound educational policy for those of the educational agencies they review, but rather that they should give "due weight" to the administrative proceedings.
Susan N. v. Wilson School District, 70 F.3d 751, 757 (3d Cir.1995) (citing Rowley, supra, and other cases). The Third Circuit has also recently stated that:
We have not spoken definitively on what constitutes "due weight" under the Rowley standard, and need not do so today. We, however, have referred to the interpretation of the standard first developed by the Court of Appeals for the First Circuit:
[T]he question of the weight due the administrative findings of fact must be left to the discretion of the trial court. The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.
Susan N., supra, at 758 (citing Town of Burlington v. Department of Educ., 736 F.2d 773, 791 (1st Cir.), aff'd on other grounds, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).
Therefore, consistent with the above language, the Court will review the claims of Plaintiffs that Lower Merion has failed to offer Christen an appropriate education based on the Court's consideration of the administrative record, the material findings of the hearing officer, and the additional testimony and evidence submitted by the parties.

B. The 1993-94 School Year
Plaintiffs contend that the educational program offered to Christen for the 1993-94 year was inappropriate. Therefore, in accordance with Rowley, the Court must determine whether the 1993-94 IEP was reasonably calculated to enable Christen to receive educational benefits. After an extensive and careful review of the record, including testimony before the Court, and in accordance with its obligation to accord "due weight" to the administrative proceedings, the Court finds by a preponderance of the evidence that Lower Merion has met its burden of showing that the 1993-94 IEP with its inclusion of an emotional support component was reasonably calculated to enable Christen to receive educational benefits and that Lower Merion offered Christen a free appropriate public education for the 1993-94 school year in accordance with its obligations under the IDEA.
As the Special Appeals Panel correctly noted, Louise G. did not dispute the specific instructional strategies of the 1993-94 IEP but only its emotional support component and the placements proposed by Lower Merion. While the record is clear that ADHD can lead to significant amounts of impulsivity, hyperactivity, and other behavioral problems which can often be addressed by different teaching styles, the Court finds that the record includes substantial and persuasive testimony from Lower Merion school officials that Christen's serious behavioral problems and emotional difficulties at Bala Cynwyd were impeding her education and required additional intervention in the form of an emotional support component to her schooling. The Court also finds persuasive the testimony in the courtroom of Defendants' expert, Dr. Barbara Sohmer, who concluded after a review of Christen's records that Christen was correctly identified by Lower Merion as suffering serious emotional *813 disturbance and that the 1993-94 IEP was appropriate. Based on a preponderance of the evidence, the Court finds that Lower Merion properly incorporated an emotional support component in Christen's 1993-94 IEP and that the IEP was reasonably calculated to enable Christen to receive educational benefit.
Christen's relative success at DVFS and Lower Merion's subsequent determination in April 1994 that Christen no longer required an emotional support component do not support a finding that Lower Merion's proposed 1993-94 IEP was inappropriate. As the Third Circuit has explained, "`evidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit.'" Susan N. v. Wilson School District, 70 F.3d 751, 762 (3d Cir.1995) (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (1993) (Garth, J.)). "Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a basic floor of opportunity." Carlisle, supra, at 533-534. Thus, the Court need not determine whether DVFS provided a superior standard of education to the appropriate education offered by the District. See Fuhrmann, supra, at 1037. It is also clear, and the Court so finds, that part of Christen's relative success at DVFS was a result of DVFS implementing many of the components of the 1993-94 IEP that Lower Merion sought to implement.
Plaintiffs and their witnesses have disputed Christen's need for emotional support and asserted that the placements offered by Lower Merion were inappropriate for Christen in part because Wordsworth Academy, Devereux, and the Project School served students who suffered from serious emotional disturbance and Christen would change her behavior to resemble those students. However, as the Court found above, Lower Merion's 1993-94 IEP and its inclusion of an emotional support component was reasonably calculated to enable Christen to receive an educational benefit because Christen's emotional difficulties were already impeding her education. Lower Merion was required by the IDEA to provide instruction that would comport with this IEP and, as Dr. Granite testified, "[s]tudents are referred [to Wordsworth, Devereux, or the Project School] because their behaviors can often be so difficult or that are so out of control that they're there primarily behaviorally for them to gain a better sense of control over themselves, their emotions, their feelings, so that they can then participate within the regular school." Based on a preponderance of the evidence and the Court's findings above as to the contents of the 1993-94 IEP, the Court finds that Lower Merion met its obligations under the IDEA in 1993-94 when it proposed placements for Christen at Wordsworth Academy, Devereux, and the Project School.
The Court also agrees with the findings of the hearing officer and the conclusions of the Special Appeals Panel regarding Louise G.'s failure to fully pursue the placements offered by Lower Merion. After extensive consideration of the record, including testimony before this Court, the Court finds that Louise G. determined prior to learning of Lower Merion's proposed 1993-94 placements that she wanted Christen to be educated at DVFS for the 1993-94 year. The record shows that Louise G. sent an application to DVFS with a $60.00 check on April 26, 1993, and that she and Christen visited DVFS in May 1993 as part of the application process; that Christen's therapist, Dr. Anderer, had previously recommended DVFS for Christen's education; that in June 1993 Louise G. requested Lower Merion to forward to DVFS a copy of the May 17, 1993, multidisciplinary evaluation (MDE) which Louise G. had described as "excellent" overall and which specifically concluded that Christen needed an emotional support program in her education; that Louise G. also asked Lower Merion to delete certain references to Christen's behavior in the MDE prior to sending the MDE to DVFS because she was afraid it would otherwise adversely affect Christen's chances of being admitted to DVFS; that when Lower Merion did offer placements at Wordsworth, Devereux, and the Project School consistent with the emotional support component of the IEP, Louise G. determined that these placements were inappropriate based on a single *814 phone call in July to each school; and that Louise G. also sent a $600.00 check to DVFS in July towards tuition for the 1993-94 school year. The record also indicates that school officials at the proposed placements were attempting unsuccessfully to schedule intake interviews with Louise G. and Christen after Louise G. sent the $600.00 check to DVFS.
The IDEA provides parents with extensive opportunities for participation in the development of IEPs and review of associated placements. Congress' goals under the IDEA will be met only if both school officials and parents attempt to cooperate in resolving disputes. Cf. Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir.1994) ("[W]e believe that the provisions of the Act can only be effectively and fairly implemented if we recognize that the interest of both the parents and the district on behalf of the child bear a corresponding respective duty  on the district to develop and justify its IEP when they think its appropriate, and on the parents to unambiguously challenge the IEP when they think it inappropriate.").
Therefore, because the Court finds that Lower Merion has met its burden of showing that the 1993-94 IEP was reasonably calculated to enable Christen to receive educational benefit and that Christen was offered a free appropriate public education when Lower Merion proposed placements consistent with this IEP, Plaintiffs are not entitled to tuition reimbursement for the 1993-94 school year as provided in Florence County and Burlington.

C. The 1994-95 School Year
In her September 19, 1994 decision, the hearing officer found that Lower Merion had failed to offer Christen a free appropriate public education for 1994-95 by offering placement at Harriton High School. The hearing officer also found that DVFS provided an appropriate education for Christen for 1994-95, but that the First Amendment barred Lower Merion from making tuition payments or providing Louise G. with tuition reimbursement for Christen to attend DVFS.
In an order accompanying her decision, the hearing officer specifically instructed Lower Merion to provide an appropriate placement for Christen because its offered placement at Harriton High School for the 1994-95 school year was inappropriate. In its November 23, 1994 decision affirming the hearing officer's decision that Lower Merion had offered an appropriate education for the 1993-94 school year, the Special Appeals Panel specifically stated that because neither Lower Merion nor Louise G. had appealed the hearing officer's rulings finding DVFS appropriate and Harriton High School inappropriate, the Panel assumed that the parties were in the process of implementing an appropriate program at a school other than DVFS for Christen for the 1994-95 school year and would do so "as quickly as possible, so that Christy's educational needs will be attended to." The Court finds that the Special Appeals Panel obviously intended Lower Merion to provide Christen with an appropriate education at a school other than DVFS as soon as possible.
In seeking tuition reimbursement for the 1994-95 school year, Plaintiffs assert that Lower Merion failed to offer Christen a free appropriate public education in accordance with the IDEA. Defendants have asserted that they did meet their obligations under the IDEA.
In the instant case, no party disputes the hearing officer's findings that DVFS offered Christen an appropriate education for the 1994-95 school year and that Lower Merion failed to offer Christen an appropriate education for the 1994-95 school year as of September 19, 1994. It is also undisputed that Lower Merion School District subsequently failed to issue a formal placement offer in the form of a Notice of Recommended Assignment (NORA) to place Christen at Hill Top Academy until April 6, 1995.
Despite Lower Merion's contention that some of the delay in finding Christen an appropriate placement should be attributed to Louise G., the Court finds that Lower Merion was obligated to provide Christen a free appropriate education for the 1994-95 school year and that Lower Merion failed to do so from as early as June 8, 1994, when it proposed Harriton High School. The Court also finds that Lower Merion was obligated *815 after the hearing officer's decision in September 1994 and the Special Appeals Panel ruling in November 1994 to expeditiously offer an appropriate placement to Christen, and that Lower Merion failed to do so.
Although the Court finds that the delay between the December 5th interview and the January psychological testing was primarily a result of a combination of school schedules and an illness suffered by Christen, and that the delay between the October 17th phone call and the December 5th interview at Hill Top Academy appears to be in part a result of Hill Top's efforts to accommodate Louise G., the Court finds that Lower Merion has provided no satisfactory explanation for why it made no formal offer of placement until April 6, 1995, nearly seven months after the hearing officer determined that Lower Merion had offered Christen an inappropriate placement at Harriton High School and ordered Lower Merion to provide Christen with an appropriate educational program.
In making these findings, the Court notes that Pennsylvania state regulations do not permit school districts to delay in addressing the needs of children with disabilities or in ensuring that IDEA requirements are met. For example, 22 Pa.Code § 14.32 provides that
(i) The following timeline governs the preparation and implementation of IEPs:
(1) An IEP shall be developed within 30 calendar days after issuance of an MDT's evaluation or reevaluation report.
(2) The IEP of each student shall be implemented as soon as possible, but no later than 10 school days after the completion of the IEP ...
Similarly, 22 Pa.Code § 14.63 provides that "[w]hen completed, the IEP ... shall be presented to the parents, along with a notice of recommended assignment signed by the school district superintendent ... and a notice of parental right to request a prehearing conference or an impartial due process hearing."
Recently, in Union School Dist. v. Smith, 15 F.3d 1519 (9th Cir.1994), the United States Court of Appeals for the Ninth Circuit considered the effects of a school district's failure to make placement offers explicit:
We find that a school district cannot escape its obligations under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement. The IDEA explicitly requires written prior notice to parents when an educational agency proposes, or refuses, to initiate or change the educational placement of a disabled child. The Supreme Court has explained the great importance of such procedural components of the IDEA. "When the elaborate and highly specific procedural safeguards embodied in § 1415 [of the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to this procedural safeguards cannot be gainsaid." Rowley, 458 U.S. [at] 205, 102 S.Ct. [at] 3050.
We find that this formal requirement has an important purpose that is not merely technical, and we therefore believe it should be enforced rigorously. The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the ... educational placement of the child." 20 U.S.C. § 1415(b)(1)(E).
Smith, supra, at 1526.
Therefore, after a review of the record, including testimony before the Court, and in accordance with this Court's obligations to give "due weight" to the findings of the hearing officer, the Court finds by a preponderance of the evidence that DVFS provided an appropriate education to Christen and that Lower Merion failed to meet its obligations under the IDEA for the 1994-95 school year because it did not make any formal offer of educational placement for *816 Christen until April 6, 1995, ten months after Lower Merion offered an inappropriate placement to Christen at Harriton High School and nearly seven months after the hearing officer determined that the offered placement at Harriton High School was inappropriate and ordered Lower Merion to provide Christen with an appropriate educational program.

D. Relief
In Florence County School Dist. Four v. Carter, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), Justice O'Connor, writing for a unanimous Supreme Court, summarized the Supreme Court's previous holding in School Comm. of Burlington v. Department of Ed. of Mass., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (Rehnquist, J., for a unanimous court) as follows:
Congress intended that IDEA's promise of a "free appropriate public education" for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents. In cases where cooperation fails, however, "parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." For parents willing and able to make the latter choice, "it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." Because such a result would be contrary to IDEA's guarantee of a "free appropriate public education," we held that "Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case."
Florence County, supra, at ___ - ___, 114 S.Ct. at 364-65 (quoting School Comm. of Burlington, supra, at 471 U.S. 359, 368, 105 S.Ct. 1996, 2002) (citations omitted). In addition to affirming that tuition reimbursement was a proper means of equitable relief under the IDEA, Florence County established that the school chosen by a parent, if later found to be appropriate, need not be an "approved private school" under state regulations. Id. at ___, 114 S.Ct. at 366. The Third Circuit has also recently explained that forms of "appropriate relief' under the IDEA were not specifically limited by Congress. See W.B. v. Matula, 67 F.3d 484, 494 (3d Cir.1995) ("[E]ven were we to limit our focus to the IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no `clear direction' sufficient to rebut the presumption that all relief is available.").
Under the guidance of Florence County, the Court finds that Christen's appropriate education at DVFS and Lower Merion's initial failure in identifying an appropriate placement for Christen for the 1994-95 year, compounded by Lower Merion's failure to promptly offer an appropriate placement, entitle Louise G. to appropriate relief in the form of tuition reimbursement based on DVFS tuition costs for the 1994-95 school year.
The Court also finds that the amount of reimbursement to which Louise G. is entitled should not be proportionally reduced because Christen could have transferred to Hill Top Academy from DVFS in April 1995. In determining the amount of reimbursement to which Louise G. is entitled, the Supreme Court has noted that a court generally has "broad discretion" in calculating relief but that "[c]ourts fashioning discretionary equitable relief under IDEA the appropriate and reasonable level of reimbursement that should be required." Florence County, supra, at ___, 114 S.Ct. at 366. While the Court notes that Plaintiffs have previously acknowledged that Hill Top could implement Christy's 1994-95 IEP but assert that Christy would experience some regression, the Court makes no finding as to the appropriateness of the education at Hill Top Academy; the Court finds that such a determination requires administrative expertise and the development of a more complete factual record than is before this Court. See Lester H. by Octavia P. v. Gilhool, 916 F.2d 865, 867 (3rd Cir.1990).
*817 The Court is well aware that Lower Merion maintains one of the finest public education systems in the entire state of Pennsylvania. Nevertheless, the Court finds that a school district does not meet its obligation under the IDEA to provide a disabled child with a free appropriate public education when it does not offer an appropriate placement until ten months after it first offers an inappropriate placement and nearly seven months after a hearing officer has found that its existing offer was inappropriate. The Court also concludes that the failure of Lower Merion to meet its IDEA obligations is particularly clear on the facts of this case, where school district officials were quite familiar with Christen's educational background. In fashioning equitable relief, and after due consideration of the testimony of both Plaintiffs' witnesses and the testimony and reports of Lower Merion officials, the Court has no doubt that transferring Christen from DVFS after April 6, 1995 for what remains of the school year would have been detrimental to her.
As noted in Florence County, supra, at ___, 114 S.Ct. at 366, "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." As testimony before the Court establishes that Christy's tuition at DVFS for the 1994-95 year was more than $5,000 less than tuition at Hill Top Academy, the Court finds that the cost of DVFS was reasonable.
Therefore, the Court will enter judgment in favor of Plaintiffs on their IDEA claim for the 1994-95 school year and award tuition reimbursement in the amount of $11,100 to Louise G., which is the cost of Christen's education at DVFS for the 1994-95 school year.

E. The First Amendment
Although the Court has concluded that Louise G. is entitled to tuition reimbursement under the IDEA for the 1994-95 school year, Defendants contend that the Establishment Clause of the First Amendment forbids any reimbursement of tuition to Louise G. because DVFS is a sectarian school. While Plaintiffs asserted at the administrative hearing that DVFS may not be sufficiently religious, the Court finds that the DVFS mandatory weekly meeting for worship consistent with Quaker religious practices for all students and staff and the "integral" relationship of this meeting to the DVFS curriculum is such that the Court will consider DVFS a sectarian school in connection with the Court's determination whether tuition reimbursement to Louise G. violates the First Amendment. See, e.g., Grand Rapids v. Ball, 473 U.S. 373, 384, 105 S.Ct. 3216, 3223 n. 6, 87 L.Ed.2d 267.
In considering Defendants' contention that an award of tuition reimbursement to Louise G. violates the First Amendment and constitutes a direct subsidy of religion, the Court must use the three-prong test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) for analyzing Establishment Clause challenges:
First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.
The Supreme Court has emphasized that the Lemon test "`provides no more than [a] helpful signpos[t]' in dealing with Establishment Clause challenges." Mueller v. Allen, 463 U.S. 388, 395, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (quoting Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)). The Supreme Court has also found that a statute which does not appear to violate the Establishment Clause "on its face" may nevertheless be unconstitutional when applied. See Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).
In considering the first prong of Lemon, there is no doubt that the IDEA has an unmistakably secular legislative purpose. After finding that more than half of eight million children with disabilities in the United States do not receive educational services, Congress specifically stated the purpose of the Act:

*818 It is the purpose of this chapter to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.
20 U.S.C. § 1400; see also Zobrest v. Catalina Foothills School District, 509 U.S. 1, 9-10, 113 S.Ct. 2462, 2467, 125 L.Ed.2d 1 (1993) (upholding provision of a government-employed sign language interpreter to a deaf student at a parochial school under the IDEA and stating that "[t]he service at issue in this case is part of a general government program that distributes benefits neutrally to any child qualifying as "handicapped" under the IDEA, without regard to the `sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends").
Because there is no dispute that the IDEA and its provisions for appropriate relief have a secular purpose under the first prong of Lemon, the central issue before the Court is whether reimbursement to Louise G. for the cost of educating Christen at DVFS for the 1994-95 school year where Lower Merion had failed to offer a free appropriate public education in accordance with its obligations under the IDEA will violate the second prong of Lemon by having a principal or primary effect that advances religion.
The tuition reimbursement ordered in this case does not violate the second prong of Lemon. It does not in any way advance religion. The only matter advanced is the determination by Congress that a disabled child shall receive a free appropriate public education. Lower Merion was obligated under the IDEA to provide Christen a free appropriate public education for the 1994-95 school year. As the Court has found, it did not do so. As Chief Justice Rehnquist stated for a unanimous Supreme Court, "[w]e are confident that by empowering the court to grant `appropriate relief' Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case ... [r]eimbursement merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." Burlington, supra, at 370-71, 105 S.Ct. at 2003.
The Court's award of reimbursement compensates the parent  not the school. In a situation such as this, where the school district failed to provide a free appropriate public education, the parent is entitled to reimbursement regardless of whether the school selected independently by the parent is a sectarian or a nonsectarian school, provided that the school selected by the parent enables the child to receive an appropriate education consistent with the child's IEP.
The IDEA offers no financial incentive to a parent to place her child at a sectarian school instead of a nonsectarian school; under the IDEA, a parent has no assurance that she will be reimbursed for the costs of educating her child because tuition reimbursement becomes available to a parent only where, as here, a school district has failed to offer a free appropriate public education in accordance with the IDEA and the parent has independently selected a school where the child has received an appropriate education. Therefore, the Court finds that reimbursement to Louise G. of the costs of educating Christen at DVFS for the 1994-95 school year will not advance religion and will not offend the Establishment Clause's traditional prohibition of direct funding of religious activity.
The Court also finds that an award to Louise G. of the costs of educating Christen at DVFS for the 1994-95 school year will not foster an excessive government entanglement with religion in violation of the third prong of Lemon. The Court is making no finding that Christen is entitled to be educated at DVFS in the future, nor is the Court reaching any conclusion as to whether Lower Merion could have originally placed Christen at DVFS for the 1994-95 school year. The Court does find, however, that an award of reimbursement by this Court requires only a one-time payment by Lower Merion to Louise G. without *819 any entanglement whatsoever between Lower Merion and DVFS.
The Court's review of recent Supreme Court opinions reinforces the Court's determination that its award of retroactive reimbursement under the IDEA does not violate the First Amendment. As Chief Justice Rehnquist explained in Zobrest, supra, at 8, 113 S.Ct. at 2466, the Supreme Court has "consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."
In Witters v. Washington Dept. of Services for Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Supreme Court, applying Lemon, found no Establishment Clause violation where the State of Washington provided financial assistance to a blind person studying to become a pastor at a private Christian college. After determining that the Washington statute had an unmistakably secular purpose, the Witters Court concluded that the Washington program did not violate Lemon's second prong by advancing religion because it was inappropriate "to view any aid ultimately flowing to [the Christian college] as resulting from a state action sponsoring or subsidizing religion." Witters, supra at 489, 106 S.Ct. at 752. In Zobrest, Chief Justice Rehnquist explained Witters as follows:
Looking at the [Washington statute] as a whole, we observed that "any aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." The program, we said, "creates no financial incentive for students to undertake sectarian education." We also remarked that ... "Washington's program is `made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.'" In light of these factors, we held that Washington's program  even as applied to a student who sought state assistance so that he could become a pastor  would not advance religion in a manner inconsistent with the Establishment Clause.
Zobrest, supra, at 9-10, 113 S.Ct. at 2467 (citations omitted).
Similarly, in Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Supreme Court, again applying Lemon, rejected an Establishment Clause challenge to a Minnesota law that permitted taxpayers to deduct certain expenses incurred in educating their children, including tuition, from their state income tax even though most of the deductions went to parents whose children attended sectarian schools. The Supreme Court found that "[a] State's decision to defray the cost of educational expenses incurred by parents  regardless of the type of schools their children attend  evidences a purpose that is both secular and understandable" and concluded that the Minnesota statute did not have "`the primary effect of advancing the sectarian aims of the nonpublic schools.'" Mueller, supra, at 395-96, 103 S.Ct. at 3067 (quoting Committee for Public Education v. Regan 444 U.S. 646, 662, 100 S.Ct. 840, 851, 63 L.Ed.2d 94 (1980)). Again, as summarized by Chief Justice Rehnquist in Zobrest:
Two factors, aside from States' traditionally broad taxing authority, informed [Mueller]. We noted that the law "permits all parents  whether their children attend public school or private  to deduct their children's educational expenses." We also pointed out that under Minnesota's scheme, public funds become available to sectarian schools "only as a result of numerous private choices of individual parents of school-age children," thus distinguishing Mueller from our other cases involving "the direct transmission of assistance from the State to the schools themselves."
Zobrest, supra, at 9, 113 S.Ct. at 2467 (citations omitted).
In Zobrest, the Supreme Court expressly relied on Mueller and Witters in concluding that provision of a sign language interpreter under the IDEA to a deaf student enrolled by his parents in a parochial school did not violate the Establishment Clause. The Supreme *820 Court rejected arguments that this IDEA aid relieved the school "of an expense that it otherwise would have assumed in educating its students," and emphasized that "[h]andicapped children, not sectarian schools, are the primary beneficiaries of the IDEA; to the extent sectarian schools benefit at all from the IDEA, they are only incidental beneficiaries." Zobrest, supra, at 12, 113 S.Ct. at 2469.
For these reasons, the Court concludes that tuition reimbursement to Louise G. on the facts of this case will not violate the First Amendment. The IDEA is "not one of the `ingenious plans for channelling state aid to sectarian schools ...'" Witters, supra, at 488, 106 S.Ct. at 752 (quoting Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 785, 93 S.Ct. 2955, 2970, 37 L.Ed.2d 948 (1973)). As Justice O'Connor explained in Florence County, a school district which seeks to avoid reimbursement to a parent for placement in an unapproved private school has alternatives:
There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.
Florence County, supra, at ___, 114 S.Ct. at 366.

F. Exhaustion of Remedies
In proceedings before this Court, Defendants have contended that the Court should not rule on any issues relating to the 1994-95 school year. Specifically, Defendants assert that Plaintiffs did not satisfy IDEA's exhaustion requirements because Plaintiffs did not appeal the hearing officer's decisions relating to the 1994-95 school year and the Special Appeals Panel therefore did not address any issues relating to the 1994-95 school year.
Although a party must normally exhaust IDEA administrative procedures, it is well-established that "[w]here recourse to IDEA administrative proceedings would be futile or inadequate, however, the exhaustion requirement is excused." W.B. v. Matula, supra, at 495. "Courts require exhaustion where the peculiar expertise of an administrative hearing officer is necessary to develop a factual record ... where the factual record is fully-developed and no evidentiary issues remain, the court can and should decide legal issues." Lester H., supra, 916 F.2d at 867.
As the above discussion of the 1994-95 school year indicates, the undisputed facts show that the hearing officer had already determined on September 19, 1994, using her "peculiar expertise," that Lower Merion offered Christen an inappropriate education at Harriton for the 1994-95 school year and that DVFS provided an appropriate education to Christen. The record is also clear that the Special Appeals Panel on November 23, 1994 again put Lower Merion on notice that Lower Merion must implement an educational program for Christen for the 1994-95 year "as quickly as possible," and it is undisputed that Lower Merion failed to issue a formal offer of placement for Christen until April 6, 1995, ten months after it first offered an inappropriate placement and nearly seven months after the hearing officer determined that the offered placement was inappropriate and ordered Lower Merion to provide Christen with an appropriate educational program.
It is clear that the hearing officer found in favor of Plaintiffs when she determined Lower Merion failed to offer Christen an appropriate education for the 1994-95 year and when she ordered Lower Merion to provide an appropriate program, and any argument that Plaintiffs should have appealed these rulings, which were in their favor, is without merit. The Court finds that requiring Plaintiffs to begin the administrative process again because Lower Merion failed to promptly implement the hearing officer's order or to respond to the Special Appeals Panel's admonition to develop an educational program for Christen "as quickly as possible" would be a futile exercise and exhaustion is therefore not required. Furthermore, the *821 Court notes that the issue as to whether the First Amendment prohibits tuition reimbursement to Louise G. for any part of the 1994-95 school year is an entirely legal issue and would not require administrative exhaustion. The record developed in the courtroom and in administrative proceedings is sufficient for this Court to make its factual findings and conclusions of law, and there is no reason in law or equity to return this matter for further administrative hearings.

G. The § 504 Claims
As noted above, the Third Circuit has found that "there appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition against discrimination by schools receiving federal financial assistance. Indeed, the regulations implementing § 504 adopt the IDEA's language, requiring that schools which receive or benefit from federal financial assistance `shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" W.B. v. Matula, supra, at 492-93.
Because of the similarities of IDEA and § 504 and available relief under both statutes, and because the Court has found that Lower Merion offered Christen an appropriate education under the IDEA for the 1993-94 school year and determined that reimbursement for the costs of Christen's 1994-95 education at DVFS constitutes appropriate relief for Lower Merion's failure to offer Christen a free appropriate education for the 1994-95 school year, the Court need not further address Plaintiffs' § 504 claim.
Although Plaintiffs have named the Superintendent of Lower Merion School District, the Lower Merion director of pupil services, and members of the Lower Merion School District Board of Education as Defendants in this action, a review of the complaint indicates that each of these individuals is sued for actions taken in their official capacities. Given the Court's award of reimbursement pursuant to the IDEA and the Court's resolution of Plaintiffs' § 504 claims, the judgment entered in favor of Plaintiffs will be limited to Defendant Lower Merion School District.

IV. Conclusion
In light of the above findings and conclusions of law, the Court will enter judgment in favor of the Defendants for Plaintiffs' IDEA claims arising out of the 1993-94 school year. The Court will also enter judgment in favor of Plaintiffs and against Lower Merion School District for Plaintiffs' claims under the IDEA arising out of the 1994-95 school year and award Louise G. tuition reimbursement in the amount of $11,100.00 against Defendant Lower Merion School District. In addition, pursuant to 20 U.S.C. § 1415(e)(2) and Fed.R.Civ.P. 54, counsel for Plaintiffs shall submit a petition for attorneys' fees within fourteen days.