**L.M., a minor child, by his parents, H.M. and E.M., Plaintiffs,**

**v.**

**EVESHAM TOWNSHIP BOARD OF EDUCATION, Defendant.**

**No. CIV.A.02–05222(FLW).**

United States District Court, D. New Jersey.

March 31, 2003.

Ira M. Fingles, Esq., Law Offices of Herbert D. Hinkle, Lawrenceville, NJ, for Plaintiffs.

Ann Marie Donio, Esq., Donio, Bertman & Donio, Esqs., William S. Donio, Esq., Donio, Bertman & Donio, Esqs., Hammonton, NJ, for Defendant.

## OPINION

WOLFSON, District Judge.

H.M. and E.M., the parents of L.M., a child classified as eligible for special education services, appeal a ruling by a New Jersey Administrative Law Judge, which held that New Jersey law precluded the Evesham School Board from reimbursing L.M.'s parents for the costs attendant to placing him in a private sectarian school while challenging the Individualized Education Plan (IEP) proposed by Evesham. For the reasons that follow, I reject that interpretation. Where the local board has failed to provide a child with a free appropriate public education, and the parents' unilateral placement was appropriate under the Individuals with Disabilities in Education Act, the sectarian nature of a private school does not bar reimbursement under New Jersey or federal law.

## BACKGROUND

### 1. The IDEA

Through the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, the federal government provides funding to assist states in educating handicapped children living within their borders. *Bd. of Educ. of the Pawling Cent. Schl. Dist. v. Schutz*, 290 F.3d 476, 481 (2d Cir.2002) (citing *Bd. of Educ. of the Hendrick Hudson Cent. Schl. Dist. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Among the IDEA's purposes is "assur[ing] that all handicapped children have available to them a free and appropriate public education ["FAPE"] which emphasizes special education and related services designed to meet their unique needs." *L.P. v. Edison Bd. of Educ.*, 265 N.J.Super. 266, 272, 626 A.2d 473 (Law Div.1993) (citing 20 U.S.C. § 1400(c)). The IDEA realizes this aim by imposing a series of goals and procedures on participating states. *See Schutz*, 290

F.3d at 481; *L.P.*, 265 N.J.Super. at 272–73, 626 A.2d 473 (describing requirements of 20 U.S.C. § 1412 and 1413).

Chief among a participating state's duties is that of creating an Individualized Education Plan ("IEP") for each disabled student within the state's school system. *Susan N. v. Wilson Schl. Dist.*, 70 F.3d 751, 756 (3d Cir.1995); *see L.P.*, 265 N.J.Super. at 272–73, 626 A.2d 473 (citing 20 U.S.C. § 1414(d)). In New Jersey, this duty can be assumed by a local educational agency ("LEA"), such as Evesham. *See* N.J.S.A. 18A:46–5.1; *L.P.*, 265 N.J.Super. at 273, 626 A.2d 473 (citing N.J.S.A. 18A:46–8). The IEP is a written statement developed by a team comprised of the disabled student's parents, at least one of his or her teachers, and other local educational agency employees. 20 U.S.C. § 1414(d)(1)(B). It includes, among other things, a statement of the student's present educational performance, measurable annual and shorter-term goals, and the services to be provided to the child. 20 U.S.C. § 1414(d)(1)(A).

The IDEA grants parents who disagree with the LEA's proposed IEP the right to challenge the IEP in a "due process" hearing via the state's administrative law process. *Schutz*, 290 F.3d at 481 (internal citations omitted) (citing *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)); *L.P.*, 265 N.J.Super. at 273–74, 626 A.2d 473. In New Jersey, this process entails filing a complaint and re-quest for a hearing with the New Jersey Department of Education. *See generally L.P.*, 265 N.J.Super. at 273–74, 626 A.2d 473; N.J.A.C.6A:14–2.7(c). New Jersey has further designated its Office of Administrative Law ("OAL") to hear the special education complaints filed with the Department. *L.P.*, 265 N.J.Super. at 274, 626 A.2d 473. The dispute is adjudicated by an Administrative Law Judge ("ALJ"), who has authority under the IDEA and New Jersey law to deem the LEA's proposed IEP inappropriate. *See id.;* N.J.A.C. 6A:14–2.7(n)–(*o*). The ALJ's decision on " ... the appropriateness of the IEP is final and binding on the parties and must be implemented without undue delay." *L.P.*, 265 N.J.Super. at 274, 626 A.2d 473; N.J.A.C. 6A:14–2.7(g). Aggrieved parties may appeal the ALJ's decision to a state or federal district court. 20 U.S.C. § 1415(i)(2).

Parents who withdraw their child from public school and unilaterally place him or her in private school while challenging the IEP may be entitled to reimbursement of their tuition costs if the ALJ finds that the LEA's proposed IEP was inappropriate, and that the parents' unilateral placement was appropriate, under the IDEA. *Florence Cty. Schl. Dist. v. Carter*, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).[1] This is the type of private school placement that is at issue in this case, and will hereinafter be referred to as a "unilateral parental placement."[2] The U.S. Supreme

---

1. The LEA's proposed IEP is deemed appropriate if it confers a meaningful educational benefit on the child and meets other substantive requirements imposed by the IDEA, *e.g.*, the services provided pursuant to the IEP must be administered in the least restrictive educational environment. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578–79 (3d Cir.2000).

2. To be clear, however, the IDEA envisions two other situations in which students with disabilities are placed in private school. The first such placement is by a public agency such as the LEA, which enables a student to receive privately, the services the LEA is obligated to provide under the student's IEP, but cannot provide within the public school system. *See* 34 C.F.R. § 300.400 (interpreting 20 U.S.C. § 1412(a)(10)(B)); N.J.S.A. 18A:46–14(g)(hereafter referred to as "LEA placements"). The second type of placement occurs when parents, who are not mounting a

Court, in endorsing parental reimbursement in such circumstances, has reasoned that parents who disagree with an IEP are forced into a Hobson's choice of simply accepting the perceived inappropriate IEP to the detriment of their child or paying for an educational opportunity that they consider appropriate. *Id.* The Court has remarked that it would be a hollow victory for parents who successfully challenge the IEP, and find their unilateral placement vindicated, to then be left without reimbursement. *Id.* Such a result would run counter to the IDEA's mandate of a free appropriate public education being afforded to every child. *Id.*

### 2. Factual and Procedural Background

The facts in this case are not in dispute, and are as follows. L.M., a 13 year-old student classified as multiple handicapped, participated in special education programs in Evesham schools from the 1995–96 through the 1998–99 school year. In May 1999, Evesham submitted its proposed IEP for the 1999–2000 school year to L.M.'s parents for their approval. The parents were dissatisfied with Evesham's plan and, when agreement could not be reached, withdrew him from the school district for that year and, at their own expense, enrolled him in Orchard Friends School ("Orchard Friends"), a private Quaker school that they considered educationally appropriate.

Shortly thereafter, the parents requested a "due process" hearing before an ALJ, alleging that the IEP proposed by Evesham was inappropriate and that Orchard Friends was an appropriate placement for L.M.. The primary relief the parents sought was reimbursement for L.M.'s private school tuition and related expenses at Orchard Friends for the 1999–2000 school year.[3] During the course of the administrative hearing, Evesham filed a motion to dismiss, arguing that New Jersey state law precluded it from reimbursing the parents for the cost of the Orchard Friends tuition. Specifically, it argued that Orchard Friends was a sectarian school and that N.J.S.A. 18A:46–14, which precludes LEAs from placing students in religious institutions, also precludes LEAs from reimbursing parents who unilaterally place their child in such an institution. Evesham further argued that federal law likewise precludes reimbursement.

After holding an evidentiary hearing on the matter, the ALJ dismissed the parents reimbursement claim for L.M.'s 1999–2000 tuition. In so doing, the ALJ agreed with Evesham that: (1) Orchard Friends School is a sectarian institution; and (2) N.J.S.A. 18A:46–14 precludes LEAs from reimbursing parents for sectarian school tuition

challenge to an IEP proposed by the LEA, but instead, choose to voluntarily effectuate a private school placement. *See* 34 C.F.R. § 300.403(a) (referring to placements made by parents when free appropriate public education is made available through the LEA); 34 C.F.R. § 300.450 (referring generally to private school placements by parents)(hereafter referred to as "voluntary parental placements").

3. By the time the hearing was scheduled, the 2000–01 school year had already commenced and the parents had decided to maintain L.M.'s placement in Orchard Friends for that year. However, for the ensuing 2001–02 school year, the parents decided to place L.M. in The Educational Community at Moorestown Children's School, a small private school that serves students with learning disabilities and attention difficulties. Although they have sought reimbursement of L.M.'s tuition costs for that year as well, those proceedings are not part of this appeal. With respect to the 2002–03 school year, the parties have reached agreement, and Evesham has placed L.M. in yet another private school for this term.

costs incurred in connection with a unilateral placement.[4] N.J.S.A. 18A:46–14 provides that

> Whenever a child study team determines that ... the most appropriate placement for that child is in an academic program in an accredited nonpublic school within the State ..., *the services of which are nonsectarian,* and which is not specifically approved for the education of handicapped pupils, that child may be placed in that academic program by the board of education, with the consent of the commissioner, or by order of a court of competent jurisdiction.

N.J.S.A. 18A:46–14 (emphasis added). This text is referred to as the "Naples Amendment" in New Jersey special education law parlance. *See e.g., W.M. and J.M. on behalf of L.M. v. Kinnelon Bd. of Educ.,* OAL Dkt. No. EDS09588–01, 2003 WL 722283 (Feb. 3, 2003). The ALJ further considered, albeit summarily, whether the IDEA preempts this provision. Relying only on *Goodall v. Stafford Cty. Schl. Bd.,* 930 F.2d 363 (4th Cir.1991), the ALJ concluded that state bans against funding sectarian schools do not conflict with the IDEA when applied to unilateral parental placements.

The parents filed a civil action in this court pursuant to 20 U.S.C.A. § 1415(i)(2) and 34 C.F.R. § 300.512, challenging the ALJ's decision. Although vigorously contested before the ALJ, L.M.'s parents no longer contest the determination that Orchard Friends is sectarian. Instead they challenge the ALJ's determination that reimbursement for unilateral parental placements in sectarian institutions is precluded as a matter of law.

While it is not entirely clear whether Plaintiffs contest the ALJ's conclusion that, as a matter of state law, the Naples Amendment extends to unilateral parental placements, they do, however, clearly assert that the ALJ erred in failing to recognize that federal law precludes LEAs from applying state standards like the Naples Amendment to unilateral parental placements such as the one at issue here, citing *Florence County Schl. Dist. v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) and 34 C.F.R. § 300.403.

Defendant Evesham argues, consistent with the ALJ's decision, that the Naples Amendment applies to unilateral parental placements as a matter of state law. In addition, it contends that the extension of the Amendment's proscription to unilateral parental placements is not barred by the IDEA and its accompanying regulations. Finally, it asserts that, in any event, reimbursement for sectarian school placements is prohibited by the Establishment Clause of the First Amendment of the United States Constitution because reimbursement would "naturally result" in the advancement of, or excessive entanglement with, religion. In response to this challenge, Plaintiffs argue that a LEA's one-time reimbursement to parents is similar to the type of state funding of sectarian educational institutions that has been upheld by the U.S. Supreme Court.

## DISCUSSION

### 1. Standard of Review

■ Though framed as a summary judgment motion, this matter is actually an appeal of the state ALJ's ruling. Although I am permitted under the IDEA to consider additional evidence not presented

---

**4.** Because the ALJ found that reimbursement was precluded, he did not reach the issue of whether Evesham's proposed IEP was appropriate or whether the unilateral placement at Orchard Friends was appropriate. In addition, the parents' subsequent claims for the 2001–02 school year are still pending before the ALJ.

below, *D.B. v. Ocean Township Bd. of Educ.*, 985 F.Supp. 457, 500 (D.N.J.1997); 20 U.S.C. § 1415(i)(2)(B)(ii), the IDEA requires that "due weight" be given to the ALJ's ruling. *Hendrick Hudson Ctrl. Schl. Dist. v. Rowley*, 458 U.S. 176, 205–06, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Carlisle Area School v. Scott P.*, 62 F.3d 520, 529 (3d Cir.1995) *cited in D.B.*, 985 F.Supp. at 500. Accordingly, I must consider the Judge's factual findings and, should I choose to find differently, explain my rationale for so doing. *Carlisle*, 62 F.3d at 529. However, my review over questions of law and the ALJ's application of legal precepts is plenary. *Id.* at 528, n. 3; *D.B.*, 985 F.Supp. at 500; *Bucks Cty. Dept. of Mental Health/Mental Retardation v. De Mora*, 227 F.Supp.2d 426, 428 (E.D.Pa.2002). *See Spectacor Mgmt. Grp. v. N.L.R.B.*, 320 F.3d 385, 390 (3d Cir. 2003); *Fotta v. Trustees of United Mine Workers of America*, 319 F.3d 612, 615–16 (3d Cir.2003).

With Plaintiffs having conceded for purposes of this appeal that the Orchard Friends School is a sectarian institution, the parties agree that the only issue before this court is a legal one [5]: whether a New Jersey LEA may reimburse parents who unilaterally placed their child in a sectarian school. I hold that New Jersey law does not preclude LEAs from reimbursing parents who withdraw their child from public school and unilaterally place him or her in a sectarian school, where the LEA's proposed IEP is deemed to have been inappropriate and the parents' unilateral placement is deemed appropriate under the IDEA. Given this holding, I remand the case to the Administrative Law Judge to determine whether Evesham's proposed IEP was appropriate and, if not, whether Orchard Friends was an appropriate placement under the IDEA.

## 2. Federal Law

◼ Unquestionably, the Supreme Court's decision in *Florence County Schl. Dist. v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), renders the Naples Amendment inapplicable to unilateral parental placements like the one at issue here. *Florence* stands for the proposition that private school unilateral parental placements need not meet the FAPE mandate, which requires that any education afforded disabled students must "meet the standards of the State educational agency," among other things.[6] 510 U.S. at 13, n. *, 114 S.Ct. 361. In that case, parents who challenged the LEA's proposed IEP sought reimbursement for costs they incurred in unilaterally placing their child in a private school that specialized in educating children with disabilities. *Id.* The school in which they placed their child met all IDEA requirements, but failed to meet the state requirement that it employ only state-certified teachers. *Id.* Ruling for the parents, the Court held that the parents' claim for reimbursement for expenses incurred in unilaterally placing their child in a private school was not barred by the private school's failure to meet state standards. This holding was later codified by the U.S. Department of Education in 34 C.F.R. § 300.403(c). *See* discussion, *infra.*

---

5. None of the ALJ's factual determinations are challenged.

6. Section 1401(a)(18) defines "free appropriate public education" as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program ...."

Defendant argues that *Florence's* holding should not be interpreted as exempting unilateral parental placements from all state standards, citing a case from this State and from another federal circuit that have relied on state standards to deny reimbursement. I find these citations inapposite. In the first case cited, *Forstrom v. Byrne*, 341 N.J.Super. 45, 775 A.2d 65 (App.Div.2001), a disabled student's parents challenged a local school district's refusal to provide speech and language services to their child, G.F., while he was schooled at home, and sought reimbursement for the cost of speech therapy services they incurred while challenging the LEA's refusal to provide these services. *Id.* at 48–49, 775 A.2d 65. New Jersey statutory law provided that only children enrolled in public or private school were entitled to services. G.F. was not enrolled in public school, and New Jersey's definition of nonpublic school did not include home schooling. The dispositive issue in that case, therefore, was whether the IDEA required the school district to provide services to G.F. despite New Jersey's exclusion of home schooled students from its statutory language. *Id.* at 51–52, 775 A.2d 65. The court held that the school district was not required by the IDEA to provide services to G.F. because, among other things, the IDEA is silent on home schooling and, further, explicitly grants states discretion to define what constitutes a private school. *Id.* at 51–53, 775 A.2d 65 (citing 20 U.S.C.A. § 1401(5) and § 1401(23), which define elementary and secondary schools, respectively, as "nonprofit institutional day or residential school[s] … as determined under State law"). Finally, Defendant cites *Hooks v. Clark Cty. Schl. Dist.*, 228 F.3d 1036 (9th Cir.2000), in which the Ninth Circuit held that a Nevadan LEA's reliance on a Nevada law that denied services to home-schooled children was proper under the IDEA using the same rationale as *Forstrom*.

*Forstrom* and *Hooks* are readily distinguishable. Both cases relied upon an IDEA educational services provision which specifically grants discretion to LEAs to define "private school." There is no comparable IDEA grant of discretion here, authorizing the LEA to deny reimbursement when the LEA has itself failed to provide a FAPE, because the placement chosen by the parents does not meet state standards. To the contrary, 34 C.F.R. § 300.403(c) states that unilateral parental placements need *not* meet state standards:

> If the parents of a child with a disability … enroll the child in a private … school without the consent of or referral by [a LEA], a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [free appropriate public education] available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. *A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the [State and Local Education Agencies.]*

(Emphasis added.) Therefore, because the IDEA's implementing regulations state explicitly that unilateral parental placements need not meet state standards, reference to the rationale of *Forstrom* and *Hooks* is inapt.

Similarly, the ALJ's reliance on *Goodall v. Stafford Cty. Schl. Bd.* is misplaced. *Goodall* involved a challenge by a disabled student's parents to the LEA's refusal to provide a cued speech interpreter to their deaf son while he was voluntarily enrolled by his parents in a sectarian school. 930 F.2d at 364. In resolving the

question of whether the school district was obligated to provide such services, the Fourth Circuit held that 34 C.F.R. § 76.532, which bans the use of federal funds to pay for religious "worship, instruction, or proselytization," precludes LEAs from providing educational services to students enrolled in sectarian schools. *Id.* at 369. The Supreme Court, however, has cast serious doubt upon the continued viability of the Fourth Circuit's interpretation of this regulation. *See Zobrest v. Catalina Foothills Schl. Dist.*, 509 U.S. 1, 6 n. 7, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), discussed *infra*. Moreover, the version of 34 C.F.R. § 300.403 in effect when *Goodall* was decided addressed neither the reimbursement issue nor the applicability of state standards to unilateral parental placements.[7] Nor did the ALJ make any attempt to reconcile *Goodall* with the Supreme Court's decision in *Florence*. *Goodall* has no current applicability here.

The U.S. Supreme Court has interpreted Federal regulation 34 C.F.R. § 76.532 (banning the use of federal funds to pay for religious "worship, instruction, or proselytization") to be coextensive with the requirements of the Establishment Clause of the U.S. Constitution. *See Zobrest v. Catalina Foothills Schl. Dist.*, *supra*, which, as discussed below, does not preclude a state from reimbursing tuition costs to parents who unilaterally place their child in a sectarian institution. Moreover, the *Zobrest* Court noted that its interpretation of section 76.532 was influenced by information that was unavailable to the Fourth Circuit. *Id.* Specifically, *Zobrest* based its determination, in part, on the United States' assertion as *amicus* in that case that the regulation should be interpreted as coextensive with the requirements of the Establishment Clause. *Id.*

The Third Circuit's decision in *T.R. v. Kingwood Twp. Bd. of Ed.*, 205 F.3d 572 (3d Cir.2000), is also instructive.[8] Drawing on the Court's rationale in *Florence*, the Third Circuit explained that "parents [are] entitled to reimbursement even [when a] school lack[s] state approval because the [FAPE] state standards requirement ... applies only to placements made by a public authority." *Id.* at 581. *See also Warren G. v. Cumberland Cty. Schl. Dist.*, 190 F.3d 80, 83 (3d Cir.1999) ("[A] private school's failure to meet state educational standards is not a bar to reimbursement under the IDEA."). The Third Circuit's characterization of *Florence's* expansive holding strongly suggests that *Florence* should be read to permit reimbursement to parents regardless of whether the unilateral parental placement meets state educational standards, including sectarian school placement bans, if the unilateral placement is appropriate and the LEA has

---

7. The version of 34 C.F.R. § 300.403 in effect at the time *Goodall* was decided provided that:
    (a) If a child with a disability has FAPE available and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. However, the public agency shall make services available to the child as provided under Secs. 300.450–300.452.
    (b) Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures of Secs. 300.500–300.515.

8. While *T.R.* involved a reimbursement claim for a unilateral parental placement, the court in that case was not called to rule on whether the parental placement was subject to state standards because it found the LEA's proposed placement appropriate under the IDEA. *Id.*

not provided a FAPE.[9]

Interpreting *Florence* in this manner does not render state laws banning payments to sectarian institutions invalid, as Defendant suggests. Obviously, state laws banning payments to sectarian institutions may govern LEA placements. Rather, this decision merely clarifies that state laws banning sectarian placements are not applicable to unilateral parental placements.

In short, I find no support for Defendant's suggestion that *Florence's* holding does not extend to unilateral parental placements in sectarian institutions. As stated by Justice O'Connor in *Florence:*

> Congress intended that IDEA's promise of a free appropriate public education for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents. In cases where cooperation fails, however, parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. For parents willing and able to make the latter choice, it would be an empty victory to have the court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.

*Florence,* 510 U.S. at 12, 114 S.Ct. 361 (internal quotation marks omitted). These words resound no less when the school chosen by the parents is sectarian. Therefore, based on *Florence's* clear dictate that

state standards do not apply to unilateral parental placements and Defendant's failure to cite authority circumscribing *Florence* in the manner it suggests, I hold that *Florence* precludes a LEA from relying on a state law that bans payment to sectarian institutions as a basis for denying parental reimbursement when the LEA has failed to provide a FAPE and the unilateral parental placement is deemed appropriate under the IDEA.

### 3. New Jersey Law

■ Even if *Florence* did not preclude state law reimbursement of sectarian school tuition costs in unilateral parental placement cases, N.J.S.A. 18A:46–14 (the "Naples Amendment") cannot be interpreted to apply to unilateral parental placements as a matter of New Jersey law.

### A. N.J.S.A. 18A:46–14—the Naples Amendment

■ On issues of statutory interpretation of a state statute, decisions of the state supreme court are authoritative. *See State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710, 713 (3d Cir.2000). Where there are no state supreme court cases that directly address the issue at hand, federal courts must consider decisions rendered by the state's lower courts as well as federal decisions interpreting state law. *Id.* Ultimately, the role of the district court is to forecast how the state supreme court would rule on the issue. *City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421 (3d Cir.2002). Here, there are no New Jersey cases that directly address whether the Naples Amendment applies at all to unilateral parental placements.[10] There-

---

9. Indeed, federal courts have applied *Florence* to a variety of state laws, *see e.g., Schutz,* 290 F.3d at 484 (applying *Florence* to state school accreditation law); *Gadsby by Gadsby v. Grasmick,* 109 F.3d 940 (4th Cir.1997) (applying

*Florence* to state law regarding out-of-state placements).

10. In *T.R.,* the Third Circuit was confronted with a unilateral parental placement effectu-

fore, I treat this issue as a matter of first impression in New Jersey.

■ As do most courts, the New Jersey Supreme Court looks first to a statute's plain language to ascertain its meaning. *Kimmelman v. Henkels & McCoy, Inc.,* 108 N.J. 123, 128, 527 A.2d 1368 (1987). Absent any contrary legislative intent, the language is to be given its ordinary meaning. *Merin v. Maglaki,* 126 N.J. 430, 434–35, 599 A.2d 1256 (1992). If the statute is not clear and unambiguous on its face, the Court will inform its interpretation of the statute by considering the statute's legislative history. *State v. S.R.,* 175 N.J. 23, 31, 811 A.2d 439 (2002).

The text of the Naples Amendment delineates the circumstances in which a disabled student may be placed in private school:

> Whenever a child study team determines that ... the most appropriate placement for that child is in an academic program in an accredited nonpublic school within the State ..., the services of which are nonsectarian, and which is not specifically approved for the education of handicapped pupils, that child may be placed in that academic program by the board of education, with the consent of the commissioner, or by order of a court of competent jurisdiction. An academic program which meets the requirements of the child's Individual Education Plan as determined by the child study team and which provides the child with a thorough and efficient education, shall be considered an approved placement ..., and the Department of Education shall be entitled to receive State aid for that child ....

N.J.S.A. 18A:46–14. Several phrases within this text make clear that the Amendment does not apply to unilateral parental placements like that at issue in this case.

The first clause of the Amendment states, "[w]henever a child study team determines ... that the most appropriate placement for that child is in ... [a] nonpublic school ...." This clause makes clear that what follows is to apply only when a child study team makes a determination that a child should be placed in a nonpublic (*i.e.* private) school.[11] Immediately following this clause, the Amendment states, "the services of which are nonsectarian." This language serves to qualify the nonpublic school referenced in the prior clause, making clear that any private school placement suggested by the child study team must be nonsectarian in nature. Because the "nonsectarian" clause follows the "whenever a child study team determines" language, it is clear that the

---

ated in New Jersey. The court in that case, however, was not asked to, nor did it, address the question of whether the Naples Amendment extends to unilateral parental placements. *See T.R. v. Kingwood Twp. Bd. of Ed.,* 205 F.3d 572 (3d Cir.2000). In addition, the several New Jersey Office of Administrative Law rulings that have tackled this issue have reached contradictory results. *See e.g., C.D. v. Wanaque Bd. of Educ.,* 93 N.J.A.R.2d 154, 1993 WL 476560 (1993) (holding that Naples Amendment does not apply to unilateral parental placements); *W.M. and J.M. on behalf of L.M. v. Kinnelon Bd. of Educ.,* OAL Dkt. No. EDS9588–01, 2003 WL 722283 (Feb. 3, 2003) (same); *K.S. v. East Brunswick Bd. of*

*Educ.,* 92 N.J.A.R.2d 159, 1992 WL 281071 (1992) (holding that unilateral parental placements are subject to Naples Amendment nonsectarian requirement). Thus there is no consistency among the ALJ decisions regarding whether the Amendment extends to unilateral parental placements. In any event, this court exercises plenary review over questions of statutory interpretation. *See Carlisle,* 62 F.3d at 529.

**11.** N.J.A.C. 6A:14–1.3 defines "nonpublic" as "an elementary or secondary education school other than a public school ...."

legislature did not intend for the nonsectarian clause to apply to any placements other than those recommended by a child study team. Unilateral parental placements, by definition, are not made on account of a child study team recommendation but, rather, are made as part of a challenge to the recommendation. *See Florence,* 510 U.S. at 12, 114 S.Ct. 361. In addition, the terminology used in the last sentence of the Amendment further clarifies that the Amendment governs only placements recommended by a child study team and effectuated by the LEA. Most notably, this language mandates that the IEP provide the child with a "thorough and efficient education," a New Jersey state constitutional requirement imposed on school districts and individual schools, *Abbott by Abbott v. Burke,* 149 N.J. 145, 198, 693 A.2d 417 (1997), not upon parents. Therefore, this language, along with the Amendment's opening reference to child study teams, makes clear that the Amendment does not apply to unilateral parental placements.

Even if I were to conclude that the Amendment is ambiguous, I would, nonetheless be compelled by the legislative history of the Amendment to hold it inapplicable to unilateral parental placements. The Assembly Education Committee Statement No. 3122—L.1989, c. 152 describes the Amendment as

> permit[ting] the placement of [handicapped] students in an academic program, rather than approved special education program, of a non-public school if,

based upon the determination of the child study team, the local board of education, with the consent of the Commissioner of Education, determines that this is the most appropriate placement for the student. This placement could also be made by order of a court of competent jurisdiction.

This passage states specifically that the LEA (referred to there as "local board of education") must determine that the private school placement is the most appropriate placement for the child in order for the placement to fall within the ambit of the Amendment. Because unilateral parental placements are necessarily effectuated without a finding by the LEA that the unilateral placement is the most appropriate for the student, *see Florence,* 510 U.S. at 12, 114 S.Ct. 361, this portion of the legislative history language strongly supports the interpretation that the Amendment does not apply to unilateral parental placements.[12] Accordingly I conclude that the Naples Amendment does not extend to unilateral parental placements.

### B. N.J.A.C. 6A:14–6.5 and N.J.A.C. 6A:14–2.10

Defendant argues that N.J.S.A. 18A:46–14's implementing regulations, which also preclude placement of students in sectarian institutions, extend to unilateral parental placements. Interpretive regulations such as these are entitled to a presumption of reasonableness and validity except in "those rare circumstances when it is clear that the [interpretation] is inconsistent

---

12. In addition, the sentence stating that the placement "could also be made by order of a court of competent jurisdiction" should be interpreted to refer to prospective placements ordered by a court to begin most likely after a due process challenge has been adjudicated. Such an interpretation is supported by the sentence following the "court of competent jurisdiction" language, which states that the

purpose of the Amendment was to "clarify the sponsor's intent that the placement must provide the student with a thorough and efficient education." As noted above, the phrase "thorough and efficient education" refers to a New Jersey constitutional requirement that applies to LEAs, not parents. *See Abbott,* 149 N.J. at 198, 693 A.2d 417.

with the legislative mandate." *In re Twp. of Warren,* 132 N.J. 1, 26, 622 A.2d 1257 (1993). This means that, if the implementing regulations extend N.J.S.A. 18A:46–14's sectarian ban to unilateral parental placements, I must defer to the interpretation of the Amendment embodied in the regulations to the extent such an interpretation is consistent with the Act. As the following analysis of the regulations will demonstrate, however, the regulations are consistent with this court's holding that the Amendment does not extend to unilateral parental placements.

The primary implementing regulation for N.J.S.A. 18A:46–14 is section (a) of N.J.A.C. 6A:14–6.5. It essentially mirrors the Amendment itself, providing that

school age students with disabilities may be placed in accredited nonpublic schools which are not specifically approved for the education of disabled students with the consent of the Commissioner of Education, by an order of a court of competent jurisdiction, or by order of an administrative law judge as a result of a due process hearing.

Section (b) of this regulation goes on to specify the criteria to serve as the basis for the Commissioner's consent. One of these criteria is that the "nonpublic school provides services which are nonsectarian." N.J.A.C. 6A:14–6.5(b)7.

Another regulation, N.J.A.C. 6A:14–2.10, specifically addresses parental reimbursement in circumstances in which parents disagree with the IEP proposed for their child by the LEA:

If the parents of a student with a disability, who previously received special education and related services from the district of residence, enroll the student in a nonpublic school ... without the consent of or referral by the district board of education, an administrative law judge may require the district to reimburse the parents for the cost of that enrollment if the administrative law judge finds that the district had not made a free, appropriate public education available to that student in a timely manner prior to that enrollment and that the private placement is appropriate.

N.J.A.C. 6A:14–2.10(b). The regulation further states that "[a] parental placement may be found to be appropriate by a court of competent jurisdiction or an administrative law judge according to N.J.A.C. 6A:14–6.5, even if it does not meet the standards that apply to the education provided by the [LEA]." *Id.*

Defendant's contention that the reference to Rule 6A:14–6.5 in Rule 6A:14–2.10(b) precludes reimbursement of Plaintiffs' tuition and related expenditures is incorrect. The plain language of N.J.A.C. 6A:14–2.10(b) makes clear that a parental placement "may be found appropriate" under N.J.A.C. 6A:14–6.5 "even if it does *not* meet the standards that apply to the education provided by the [LEA]." (Emphasis added.) The agency's use of the words "even if" indicates that the Rule 6A:14–6.5 standards—nonsectarian requirement included—are not to be applied to unilateral parental placements.

Not only would it be inconsistent with the plain language of N.J.A.C. 6A:14–2.10 to apply Rule 6A:14–6.5(b) to unilateral parental placements, but other language in Rule 6A:14–2.10 makes clear that the Rule 6A:14–6.5(b) requirements ought not be applied in that fashion. Most notably, subsection (10) of Rule 6A:14–6.5(b) requires that "[t]he placement ... not [be] contested by the parents." This requirement is illogical in the context of a unilateral parental placement, where the parents have necessarily objected to the LEA's proposed IEP in order to trigger their reimbursement rights under N.J.A.C. 6A:14–

2.10(b). *See* N.J.A.C. 6A:14–2.10(c) (stating that parents' cost of reimbursement may be denied if the parents failed to inform the child study team at the most recent IEP meeting of their concerns and intent to enroll their child in a nonpublic school). Because New Jersey courts will interpret laws to make intrinsic sense, *see DeLisa v. County of Bergen*, 165 N.J. 140, 147, 755 A.2d 578 (2000), N.J.S.A. 6A:14–2.10 should not be interpreted to apply to unilateral parental placements.

The ALJ's reasoning in *W.M. and J.M. on behalf of L.M. v. Kinnelon Bd. of Educ.*, OAL Dkt. No. EDS9588–01, 2003 WL 722283 (Feb. 3, 2003), is consistent with my interpretation of sections 6.5 and 2.10 of the implementing regulations. In that case, parents of a disabled student sought reimbursement for tuition paid to a private school not approved for the education of handicapped pupils. *Id.* The LEA argued that the Naples Amendment prohibited the parents from seeking reimbursement for their unilateral placement. *Id.* In rejecting the LEA's position, the ALJ explained that "[a]n examination of the regulatory requirements indicate that the [Amendment] is only an available resource for school districts, *rather than parents*, when more conventional placements are not available for the child in question, and the school district remains obligated to provide the child a FAPE." *Id.* at 31 (emphasis added). The ALJ further concluded "that the limitations regarding placement imposed by the [Naples Amendment] are not applicable to ... [a] unilateral placement." *Id. See also H.W. and J.W. on behalf of A.W. v. Greater Brunswick Charter Schl. and Highland Park Bd. of Ed.*, OAL Dkt. No. EDS 905–00, 2001 WL 1023471 (Aug. 28, 2001).

Finally, the U.S. Supreme Court has admonished that when interpreting a state statute which may conflict with federal law, "... the proper approach is to reconcile the operation of both statutory schemes with one another ...." *Merrill Lynch v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) *cited in Ford Motor Co. v. Ins. Comm'r*, 874 F.2d 926, 936 (3d Cir.1989). Interpreting N.J.S.A. 18A:46–14 in the manner set forth herein properly reconciles this provision with *Florence's* holding that unilateral parental placements need not meet state standards and with 34 C.F.R. § 300.403(c). Therefore, for this and each of the reasons detailed above, I hold that neither N.J.S.A. 18A:46–14 nor its implementing regulations extend to unilateral parental placements.

### 4. Establishment Clause

■ Finally, Evesham argues that even if the Naples Amendment does not preclude it from reimbursing L.M.'s parents for the private school tuition costs they incurred while he was unilaterally placed by them at a sectarian institution, it is prevented from so doing by the Establishment Clause of the First Amendment.

■ Using the framework established by the U.S. Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to be constitutional, a state action must: (1) reflect a secular legislative purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive entanglements with religion. *Walz ex rel Walz v. Egg Harbor Twp. Bd. of Ed.*, 187 F.Supp.2d 232, 242 (D.N.J.2002) (citing *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105).

Recently, the Supreme Court has adhered to Justice O'Connor's "endorsement test" in Establishment Clause cases involving challenges to private individuals' use of government resources. *See Tenafly Eruv Assn. v. Tenafly*, 309 F.3d 144, 174 (3d Cir.2002) (collecting cases). In *Zelman v.*

*Simmons–Harris,* 536 U.S. 639, 122 S.Ct. 2460, 2476, 153 L.Ed.2d 604 (2002), Justice O'Connor described the endorsement test as a refinement of the *Lemon* test:

> A central tool in [the Court's] analysis of cases in this area has been the *Lemon* test. As originally formulated, a statute passed this test only if it had "a secular legislative purpose," if its "principal or primary effect" was one that "neither advance[d] nor inhibit [ed] religion," and if it did "not foster an excessive government entanglement with religion." In *Agostini v. Felton,* 521 U.S. 203, 218, 232–233[, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)], we folded the entanglement inquiry into the primary effect inquiry. This made sense because both inquiries rely on the same evidence, see *ibid.,* and the degree of entanglement has implications for whether a statute advances or inhibits religion, *see Lynch v. Donnelly,* 465 U.S. 668, 688[, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)] (O'Connor, J., concurring). The [endorsement] test … clarifies the basic inquiry when trying to determine whether a program that distributes aid to beneficiaries, rather than directly to service providers, has the primary effect of advancing or inhibiting religion, *Lemon v. Kurtzman, supra,* at 613–614[, 91 S.Ct. 2105] … or, as I have put it, of "endors[ing] or disapprov[ing] … religion," *Lynch v. Donnelly, supra,* at 691–692[, 104 S.Ct. 1355] ….

(O'Connor, J., concurring).

The endorsement test instructs courts to consider two factors. The first factor is "whether the program administers aid in a neutral fashion, without differentiation based on the religious status of beneficiaries or providers of services." *Id.* (O'Connor, J., concurring); *see also id.* at 2467. The second, and perhaps, more important factor, is "whether beneficiaries of indirect aid have a genuine choice among religious and nonreligious organizations when determining the organization to which they will direct that aid." *Id.* at 2476 (O'Connor, J., concurring); *see also id.* at 2467. As explained by Justice O'Connor, "[i]f the answer to either query is 'no,' the program should be struck down under the Establishment Clause." *Id.* at 2476 (O'Connor, J., concurring). This test has also been described by the Third Circuit as: whether a reasonable, informed observer, *i.e.,* one familiar with the history and context of private access to the public money or property at issue, would perceive the challenged government action as endorsing religion. *Tenafly,* 309 F.3d at 174. Because this an indirect aid case, *see Zelman,* 122 S.Ct. at 2465, 2467 (defining indirect aid cases as involving disbursements that reach sectarian institutions "only by way of the deliberate choices of … private individuals"), I will analyze the facts in the context of the endorsement test. *See Tenafly,* 309 F.3d at 174.

Applying the endorsement test, I am satisfied that the LEA's reimbursement to parents for expenses incurred by withdrawing their disabled child from the public school system that they believe is not providing their child a FAPE, and unilaterally placing him in a sectarian school which they believe satisfies his educational needs, does not violate the Establishment Clause.

In *Zelman v. Simmons–Harris, supra,* an Ohio private school tuition voucher program designed to encourage parents of children attending public, state-run schools to explore alternative schooling options was challenged. *Id.* at 2463. The program distributed aid to the parents, who in turn, directed the funds to the participating school of their choice. *Id.* All sectarian and nonsectarian private schools that met statewide educational standards and were located in the boundaries of a covered

district were eligible to participate in the program. *Id.* Because funds disbursed via this program were not paid directly to sectarian institutions but could reach them "only by way of the deliberate choices of numerous private individuals," the Court characterized the program as falling within its "indirect aid" line of Establishment Clause cases. *Id.* at 2465, 2467.

After considering the two factors at issue in indirect aid cases—(1) whether the program is neutral with respect to religion; and (2) whether it administers aid directly to private individuals who, thereafter, directed the aid to a sectarian institution wholly as a result of their own genuine and independent choice—the *Zelman* Court concluded that the Ohio program did not violate the Establishment Clause. *Id.* at 2467; *see also id.* at 2476 (O'Connor, J., concurring). Instead, the program was deemed neutral with respect to religion because it was made available to parents who chose sectarian and nonsectarian schools alike, it allowed both sectarian and nonsectarian private schools to participate in the program, and did not include any financial incentives that skewed the program toward sectarian schools. *Id.* at 2467–68. The Court analyzed the second factor, whether the program provided parents true independent choice, by asking whether the program operated in such a manner so as to coerce parents into sending their children to sectarian schools. *Id.* at 2469. It found no evidence that the program had done so, nor that it was likely to do so given the number of aid options it provided parents. *Id.*

Likewise, the IDEA's reimbursement scheme for unilateral parental placements does not violate the Establishment Clause. Its reimbursement scheme is a form of indirect aid because the reimbursement funds reach sectarian institutions only as a result of the wholly independent choices of

individual parents. The reimbursement scheme is also neutral with respect to religion because it applies equally to sectarian and nonsectarian unilateral parental placements, does not discriminate in favor of or against sectarian institutions themselves, and does not include any financial incentives that skew the program toward sectarian schools. *Accord Christen G. v. Lower Merion Schl. Dist.,* 919 F.Supp. 793, 818–19 (E.D.Pa.1996) (holding that a school district's reimbursement to parents for sectarian school tuition costs does not constitute an Establishment Clause violation for these reasons, among others). As to this latter point, many courts have pointed out that parents who choose to unilaterally place their child in a nonpublic school while awaiting a due process hearing risk not being reimbursed either because the LEA's proposed IEP was adequate or the parents' school choice is later deemed inappropriate. *See Florence,* 510 U.S. at 15, 114 S.Ct. 361 (internal citation omitted); *Knable ex rel. Knable v. Bexley City Schl. Dist.,* 238 F.3d 755, 763 (6th Cir.2001); *Connors v. Mills,* 34 F.Supp.2d 795, 802 (N.D.N.Y.1998). This risk extends equally to parents who choose sectarian or nonsectarian schools, and therefore does not create a financial incentive for parents to choose the former over the latter. *Christen G.,* 919 F.Supp. at 818. In addition, the IDEA's reimbursement scheme provides parents true, independent choice because the only requirement it imposes with respect to the institution chosen by the parents, *i.e.,* that the parent's placement be deemed appropriate under the IDEA, applies to sectarian and nonsectarian schools alike and, therefore, cannot have the effect of coercing parents into choosing sectarian placements. Accordingly, the IDEA's reimbursement scheme does not violate the U.S. Constitution's Establishment Clause.

Defendant attempts to avoid the implications of *Zelman*, however, by urging that compliance with the IDEA would result in an excessive "entanglement" with religion, because in its view, "in the complex rules, regulations, and procedures integral to the provision of special education services to eligible children, the [LEA] would as a matter of course become excessively entangled in the working of a sectarian school." Br. in Opp. to Pl. Motion and in support of Def. Cross–Motion for Summ. Jdgmt. at 17–18.

Defendant's argument misses the mark. "Entanglement" is not an issue in indirect aid cases like the one presented here. *See Tenafly*, 309 F.3d at 174, n. 36 (noting that entanglement inquiry is relevant only in direct aid cases). Moreover, a ruling granting reimbursement does not require Evesham to reimburse L.M.'s parents on a going forward basis. *Schutz*, 290 F.3d at 484 ("[O]ur conclusion does not mean that the [LEA] must fund [the student's] tuition ... for the remainder ·of his education, but rather that, until a new placement is established by either an actual agreement between the parents and the [LEA], or by an administrative decision upholding the [LEA's] proposed placement which [the parents] choose not to appeal, or by a court, the [LEA] remains financially responsible.") (quoting *Murphy v. Arlington Cent. Schl. Dist. Bd. of Ed.*, 86 F.Supp.2d 354, 366 (S.D.N.Y.2000) (internal quotation marks omitted)). Rather, "reimbursement merely requires [the LEA] to belatedly pay expenses that it ... should have paid all along and would have borne in the first instance had it developed a proper IEP." *Christen G.*, 919 F.Supp. at 818 (quoting *Schl. Comm. of Burlington v. Dept. of Ed. of Mass.*, 471 U.S. 359, 370–71, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

Even if entanglement were an issue, Defendant has not shown how its one-time reimbursement to L.M.'s parents of L.M.'s 1999–2000 school year expenses would lead to excessive entanglement. The only issue in this case is whether L.M.'s parents should be reimbursed for the tuition they paid to Orchard Friends School—not whether L.M. should be placed there on a prospective basis. The practical effect of Evesham's reimbursement is simply to disburse funds to L.M.'s parents in one lump sum on one occasion. *Id.* Evesham need not interact or communicate in any way with Orchard Friends in order to comply with the reimbursement order. It is difficult to fathom how the required reimbursement order would cause Evesham to become entangled with the workings of a sectarian school.

## CONCLUSION

For the foregoing reasons, a local educational agency is not precluded from reimbursing parents who withdrew their child from public school and unilaterally placed him or her in a private, sectarian school while challenging the agency's proposed Individualized Educational Plan. This matter is remanded to the Administrative Law Judge to determine whether Evesham failed to provide L.M. a free appropriate public education and, if so, whether his parents' unilateral placement of him at Orchard Friends School was otherwise appropriate under the IDEA, even if it did not meet all state standards. *See Carlisle*, 62 F.3d at 526 (holding that district court may remand to ALJ for further proceedings). If the ALJ concludes that Evesham failed to provide L.M. a free appropriate public education and that Orchard Friends was an appropriate placement, the parents will be entitled to reimbursement for L.M.'s educational expenses.